CALLAHAN & BLAINE, APLC
Daniel J. Callahan (Bar No. 91490)
   dcallahan@callahan-law.com
Richard T. Collins (Bar No. 166577)
   rcollins@callahan-law.com
Damon D. Eisenbrey (Bar No. 215927)
   deisenbrey@callahan-law.com
Adrian L. Canzoneri (Bar No. 265168)
   acanzoneri@callahan-law.com
3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
Telephone: (714) 241-4444
Facsimile: (714) 241-4445

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VENTURA RECOVERY CENTER, INC.; HILLSIDE LAGUNA BEACH LLC; and SHEER RECOVERY, LLC, <br><br> Plaintiff, <br><br> v. <br><br> HEALTH NET, INC.; HEALTH NET OF CALIFORNIA, INC.; HEALTH NET LIFE INSURANCE COMPANY,; MANAGED HEALTH NETWORK, INC.; CENTENE CORPORATION; and DOES 1 through 25, inclusive, <br><br> Defendants. | CASE NO. 2:21-cv-4427 MCS (JDE) <br><br> *Hon. Mark C. Scarsi* <br><br> **FIRST AMENDED COMPLAINT FOR:** <br><br>   **1. CLAIMS FOR PLAN BENEFITS UNDER ERISA, 29 U.S.C. §1132(a)(1)(B)** <br>   **2. BREACH OF WRITTEN CONTRACT** <br>   **3. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** <br>   **4. PROMISSORY ESTOPPEL** <br>   **5. UNFAIR COMPETITION** <br><br> **DEMAND FOR JURY TRIAL** <br><br> Complaint Filed:   April 8, 2021 <br> Trial Date:          None Set |

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COMPLAINT

Plaintiffs Ventura Recovery Center, Inc., Hillside Laguna Beach, LLC, and Sheer Recovery, LLC hereby allege against Defendants Health Net, Inc., Health Net of California, Inc., Health Net Life Insurance Company, Managed Health Network, Inc., Centene Corporation, and DOES 1 through 25, inclusive, as follows:

## THE PARTIES

### Plaintiffs

1.     Plaintiff Ventura Recovery Center, Inc. (TIN 77-026022) ("VRC") is, and at all relevant times herein mentioned was, a California corporation qualified to do business in the State of California.  VRC is, and at all relevant times herein was, an alcoholism and substance use disorder treatment provider.  VRC is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  VRC is, and at all relevant times herein was, licensed and certified by the California Department of Health Care Services ("DHCS") to operate an alcoholism and substance use disorder treatment facility and program.  VRC is, and at all relevant times herein was, accredited by The Joint Commission, Behavioral Health Care Accreditation Program ("JCAHO"), and has a Centers for Medicare and Medicaid Services ("CMS"), Clinical Laboratory Improvements Amendments ("CLIA") certificate of waiver.

2.     Plaintiff Hillside Laguna Beach, LLC (TIN 47-2829432) ("Hillside") is, and at all relevant times herein mentioned was, a California corporation qualified to do business in the State of California.  Hillside is, and at all relevant times herein was, an alcoholism and substance use disorder treatment provider. Hillside is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  Hillside is, and at all relevant times herein was, licensed and certified by the DHCS to operate an alcoholism and substance use disorder treatment facility and program.  Hillside is, and at all relevant times herein was, accredited by JCAHO.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

3.      Plaintiff Sheer Recovery, LLC (TIN 47-4827286) ("Sheer Recovery") is, and at all relevant times herein mentioned was, a California corporation qualified to do business in the State of California.  Sheer Recovery is, and at all relevant times herein was, an alcoholism and substance use disorder treatment provider.  Sheer Recovery is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  Sheer Recovery is, and at all relevant times herein was, licensed and certified by the DHCS to operate an alcoholism and substance use disorder treatment facility and program, including to provide incidental medical services ("IMS").  Sheer Recovery is, and at all relevant times herein was, accredited by JCAHO, and has a CMS, CLIA certificate of waiver.

**Defendants**

4.      Defendant Health Net, Inc. ("HNI") was and is at all relevant times herein mentioned a Delaware corporation and a licensed health care insurer, with its principal place of business in Woodland Hills, California.

5.      Defendant Health Net of California, Inc. ("HNCI") was and is at all relevant times herein mentioned a California corporation and a licensed health care insurer, with its principal place of business in Woodland Hills, California.

6.      Defendant Health Net Life Insurance Company ("HNLIC") was and is at all relevant times herein mentioned a California corporation and a licensed health care insurer, with its principal place of business in Woodland Hills, California.

7.      Defendant Managed Health Network, Inc. ("MHNI") was and is at all relevant times herein mentioned a Delaware corporation and a licensed health care insurer, with its principal place of business in Rancho Cordova, California.

8.      Defendant Centene Corporation ("Centene") was and is at all relevant times herein mentioned a Delaware corporation and a licensed health care insurer, with its principal place of business in St. Louis, Missouri.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COMPLAINT

9.      Upon information and belief, Plaintiffs allege that Centene acquired HNI through merger in 2015, which was approved by the California Department of Managed Health Care ("DMHC") and the California Department of Insurance ("CDI") in 2016, and is now the parent company or successor in interest of, and thereby liable for the acts and omissions of HNI, HNCI, HNLIC, and MHNI.

10.      Plaintiffs are informed and believe that, at all relevant times, each of the Defendants was and is the agent, servant, representative, undisclosed principal and/or alter ego of each of the other Defendants, and in doing the things herein alleged, each of the Defendants was acting in the scope of its authority as such agent, servant, representative, undisclosed principal and/or alter ego, and with the permission and consent of each of the other Defendants.

11.      Plaintiffs are informed and believe that, at all relevant times, Defendants are the alter egos of the other Defendants, have comingled assets, have comingled business operations, have undercapitalized operations, have ignored corporate formalities, and have exercised such dominion and control over the operations of the other Defendants that it would be unjust to permit such Defendants to avoid individual liability.  Plaintiffs are further informed and believe, that a unity of interest and ownership exists between Defendants, that any individuality and separateness between Defendants have ceased, and that Defendants are the alter egos of one another.  On further information and belief, Plaintiffs allege that Defendants share the same common ownership, management, places of business, and operate as a single enterprise.

12.      Plaintiffs are informed and believe that, at all relevant times, each of the Defendants formed and operated a conspiracy with each of the other Defendants to perform the acts alleged herein, in furtherance of a common design to place profits over patients and damage substance use disorder treatment providers and laboratories, including Plaintiffs, and with knowledge that the conduct alleged herein of each of the Defendants constituted violations of law and provided

1    substantial assistance or encouragement to each other to so act against insured

2    patients and substance use disorder treatment providers and laboratories, including

3    Plaintiffs.

4        13.    Plaintiffs are informed and believe that, at all relevant times, each of

5    the Defendants were licensed and/or regulated by the CDI and/or the DMHC to

6    transact the business of insurance in the State of California, are in fact transacting

7    the business of insurance in the State of California, and are thereby subject to the

8    laws and regulations of the State of California.

9                    **BRIEF STATEMENT OF THE CASE**

10        14.    Plaintiffs are out-of-network substance use disorder treatment providers

11   and clinical laboratories.  Plaintiffs are in the profession of helping individuals

12   recover from alcoholism and addiction and return to their families and communities

13   as productive and contributing members of society.  Plaintiffs provided medically

14   necessary, verified, preauthorized and covered substance use disorder treatment and

15   laboratory services to 27 individuals with health insurance that was sold, insured,

16   managed and/or administered by Defendants.  The treatment and services provided

17   by Plaintiffs include residential detoxification and residential treatment ("RTC"),

18   partial hospitalization/day treatment ("PHP"), intensive outpatient ("IOP"),

19   outpatient ("OP"), treatment planning, counseling and behavioral therapies,

20   individual, family and group therapy, medication management, case management

21   services, and laboratory services to, among other things, determine, measure, or

22   otherwise describe the presence or absence of various substances in the body.  The

23   treatments and services were provided by or under the direction of properly

24   qualified behavioral health providers and/or medical and clinical professionals.

25        15.    Defendants' health insurance plans, for each of the 27 insureds at issue,

26   provide coverage for out-of-network substance use disorder treatment and

27   laboratory services.  In this regard, the plans, and each of them, provide that out-of-

28   network substance use disorder benefits include the following levels of care: RTC,

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 4 -

1  PHP, IOP, and OP.  The plans also provide that out-of-network covered substance
2  use disorder services include: diagnostic evaluations, assessment and treatment
3  planning, treatment and/or procedures, medication management and other associated
4  treatment, psychological testing, referral services, individual, family and group
5  therapy, provider-based case management services, and crisis intervention.  The
6  plans further provide coverage for out-of-network laboratory benefits, which include
7  the facility charge and the charge for supplies and equipment, physician services for
8  pathologists, and presumptive drug tests and definitive drug tests.

9       16.    Defendants' policies at issue in this action are the 2017 and 2018
10  individual preferred provider organization ("PPO") policies.  The HNI 2017
11  individual PPO health insurance policies provided that the Maximum Allowable
12  Amount to be paid to out of network mental health providers is determined as
13  follows:

14  The Maximum Allowable Amount for facility services, including but not limited to Hospital, Skilled Nursing
    Facility, and Outpatient Surgery, is determined by applying 150% of the Medicare Allowable Amount.
15  Maximum Allowable Amount for Physician and all other types of services and supplies is the lesser of the
    billed charge or 100% of the Medicare Allowable Amount.
16  In the event there is no Medicare Allowable Amount for a billed service or supply code:
17      a.  Maximum Allowable Amount for professional and ancillary services shall be 100% of FAIR Health's
            Medicare gapfilling methodology. Services or supplies not priced by gapfilling methodology shall be
18          the lesser of: (1) the average amount negotiated with Preferred Providers within the geographic
            region for the same Covered Services or Supplies provided; (2) 50th percentile of FAIR Health
19          database of professional and ancillary services not included in FAIR Health Medicare gapfilling
            methodology; (3) 100% of Medicare Allowable Amount for the same Covered Services or Supplies
20          under alternative billing codes published by Medicare; or (4) 50% of the Out-of-Network Provider's
            billed charges for Covered Services. A similar type of database or valuation service will only be
21          substituted if a named database or valuation services becomes unavailable due to discontinuation by
            the vendor or contract termination.
22      b.  Maximum Allowable Amount for facility services shall be the lesser of: (1) the average amount
            negotiated with Preferred Providers within the geographic region for the same Covered Services or
23          Supplies provided; (2) 100% of the derived amount using a method developed by Data iSight for
            facility services (a data service that applies a profit margin factor to the estimated costs of the
24          services rendered), or a similar type of database or valuation service, which will only be substituted if
            a named database or valuation services becomes unavailable due to discontinuation by the vendor or
25          contract termination; (3) 150% of the Medicare Allowable Amount for the same Covered Services or
            Supplies under alternative billing codes published by Medicare; or (4) 50% of the Out-of-Network
            Provider's billed charges for Covered Services.

26      17.    Medicare does not provide a rate for inpatient, residential or outpatient
27  facility based charges for substance use disorder services because such facilities are
28  not eligible to participate in Medicare.  Consequently, pursuant to the terms of

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1  Defendants' policies, Defendants were required to pay facility claims for inpatient,

2  residential or outpatient treatment based on 50% of the charges billed by the

3  facility.[1]

4      18.    Each of Defendants' insureds orally assigned benefits and payments by

5  their insurance company or health plan to Plaintiffs and Plaintiffs obtained written

6  assignments of benefits from each of the insureds at issue, by which Defendants'

7  insureds intended to, and did, assign to Plaintiffs not only rights to payment of

8  claims but to assert all rights and causes of action against Defendants in connection

9  with such claims.

10     19.    In reliance on the assignments of benefits, Plaintiffs, and each of them,

11 rendered the subject treatment and services to Defendants' insureds/members.

12 Moreover, Defendants confirmed, represented, promised and warranted to Plaintiffs

13 through the required verification of benefits and the preauthorization process, that

14 each of the insureds and their respective out-of-network treatments and services

15 were covered by health insurance plans issued, managed and/or administered by

16 Defendants, the premiums were paid and the plans were effective, and that Plaintiffs

17 would be paid for treating Defendants' insureds.  In reliance on Defendants'

18 coverage representations and payment promises, Plaintiffs, and each of them,

19 rendered the subject treatment and services to Defendants' insureds/members.  At all

20 times relevant herein, Defendants knew that Plaintiffs were treating and providing

21 services, and would continue to treat and provide services, to their insureds, and

22 Defendants were, at all times, advised and fully aware of Plaintiffs' charges for the

23 treatment and services rendered, at each level of care.

24     20.    After providing covered treatment and services to the 27 insureds at

25 issue, Plaintiffs submitted their claims to Defendants for payment, with the claim

26 forms notifying Defendants that Plaintiffs were submitting the claims as the

27 _____

28 [1] This amount represents a reduction from Defendants' prior reimbursement methodology – *e.g.* its 2015 and 2016 policies – that provided for payment at 75% of the provider's billed charges.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

insureds' assignee.  Defendants were obligated – under the law and the plans – to pay Plaintiffs the applicable plan percentage of their covered charges (50% of billed charges) until the insured's nominal annual out-of-pocket maximum is met, at which time Defendants pay 100%.  Defendants also advised, confirmed and promised to Plaintiffs during the verification and benefits and preauthorization process for each of the 27 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like Plaintiffs, for all levels of substance use disorder treatment, is a percentage of their covered charges (50% of billed charges) until the insured's nominal annual out-of-pocket maximum is met, at which time Defendants pay 100%.

21.     Instead of paying Plaintiffs per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to Plaintiffs, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Plaintiffs, as a group, an average of *1.9%* of their covered charges.  Specifically, Defendants only paid $51,710.72 out of Plaintiffs' $3,232,419.10 in covered charges.  It was only after Plaintiffs rendered the treatment and services at issue that Defendants refused to properly compensate Plaintiffs for the covered treatment and services rendered to Defendants' insureds, despite making continued post-treatment promises that payment would be forthcoming.

22.     During the claim submission and payment process, Defendants put Plaintiffs on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Plaintiffs, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  Plaintiffs complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse Plaintiffs for the covered

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide Plaintiffs and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Plaintiffs and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flags and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Plaintiffs (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

23.     Defendants never informed or advised Plaintiffs during the claim submission and payment process or post-claims process, and never denied Plaintiffs payment on the grounds of any anti-assignment provisions in the health plans at issue.  As a result, and by operation of law and principles of equity, Defendants have waived and are estopped from asserting any such anti-assignment provisions in any of the health plans at issue in this action.[2]

24.     As a result, Plaintiffs have suffered and continue to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment

---

[2] *See, California Spine and Neurosurgery Institute v. Blue Cross of California*, 2020 WL 3536496 at *1 (9th Cir. June 30, 2020) ("district court erred in determining waiver was inapplicable[;]" and "district court also erred in concluding that [Plaintiff] failed to satisfy three equitable estoppel factors" when insurer asserted for the first time in litigation an anti-assignment provision to avoid coverage.); *Spinedex Physical Therapy USA, Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1296 (9th Cir. 2014) (considering an anti-assignment provision and explaining that "an administrator may not hold in reserve a known or reasonably knowable reason for denying a claim, and give that reason for the first time when the claimant challenges a benefits denial in court."); *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 720 (9th Cir. 2012) ("ERISA and its implementing regulations are undermined where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary.").

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1  promises to Plaintiffs, the interruption in Plaintiffs' businesses, lost business

2  opportunities, lost profits and other consequences, and moreover, Plaintiffs are

3  entitled to injunctive relief and statutory and prejudgment interest and attorney's

4  fees against Defendants, and each of them.

5  <u>**AMERICA'S SUBSTANCE USE DISORDER EPIDEMIC**</u>

6      25.    The Substance Abuse and Mental Health Services Administration

7  (SAMHSA) estimates that in 2014, 20.2 million adult Americans, or 8.4 percent of

8  the adult population suffered from a substance use disorder within the past year.[3]

9  According to the President's Commission on Combatting Drug Addiction and the

10  Opioid Crisis (November 2017), heroin overdose deaths increased four-fold from

11  2010 to 2015, while overdose deaths due to prescription opioids consistently

12  outpaced even the disturbingly high heroin overdose rates.[4]  Drug overdoses now

13  cause more deaths than either car accidents or guns, and those suffering from

14  substance use disorders are at the highest risk.

15      26.    On average, 130 Americans die every day from an opioid overdose.

16  The opioid crisis has and continues to destroy lives and devastate families and

17  communities.[5]  It is the deadliest drug crisis in United States history and it is only

18  getting worse.[6]  In 2017 alone, California lost 2,196 lives to the opioid epidemic.

19  Timely access to life-sustaining and life-saving treatment and continuing care for

20  

21  [3] *See* Rachel N. Lipari & Struther L. Van Horn, Trends in Substance Use Disorders in Adults 18 and Older (June 29, 2017), retrieved on May 23, 2019 from

22  https://www.samhsa.gov/data/sites/default/files/report_2790/ShortReport-2790.html.

23  [4] *See* President's Commission on Combatting Drug Addiction and the Opioid Crisis, Final Report, at p. 32, retrieved on May 23, 2019 from

24  https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-15-2017.pdf.

25  [5] *See* Centers for Disease Control and Prevention, Understanding the Epidemic, retrieved on May 28, 2019 from https://www.cdc.gov/drugoverdose/epidemic/index.html.

26  [6] *See* California Department of Public Health, Patterns of Opioid-Related Overdose Deaths in California, 2011-2017 (March 2019), retrieved on June 12, 2019 from

27  https://www.cdph.ca.gov/Programs/CCDPHP/DCDIC/SACB/CDPH%20Document%20Library/Prescription%20Drug%20Overdose%20Program/Injury%20Data%20Brief%20Opioid%20Overdose

28  %20Deaths%202011-2017_ADA.pdf.

substance use and mental health disorders is critical to preventing these deaths and allowing people to achieve long-term recovery and to return to their families, friends and communities as healthy, productive and contributing members of society.[7]

27.     Addiction is recognized as a chronic, relapsing brain disorder characterized by compulsive drug seeking, continued use despite harmful consequences, and long-lasting changes in the brain.  Addiction is considered both a complex brain disorder and a mental illness.  The brain changes can be long lasting and can lead to many harmful, often self-destructive, behaviors.  Addiction is the most severe form of a full spectrum of substance use disorders, and is a medical illness caused by repeated misuse of a substance or substances.[8]  Without treatment and engagement in recovery activities, addiction is progressive and can result in unemployment, homelessness, disability and premature death.

28.     Substance use disorder treatment is difficult and the challenges of recovery from addiction are many, which can involve cycles of recurrence and remission before long-term recovery is realized.  Timely access to treatment and continuing care, including RTC, PHP, IOP and OP treatment, medication management, psychological testing, counseling and behavioral therapies, social support and supportive sober living environments, are critical for people to recover

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

---

[7]   The human impact of the opioid epidemic – from babies born dependent, the emotional toll on individuals with a substance use disorder, and that of their families and communities, to the tens of thousands of lives cut short each year – has been tremendous.  Now, reports show that the economic impact has been just as shocking, with the drug crisis costing the U.S. economy $1 trillion since 2001 and likely to cost the economy an additional $500 billion by 2020 if the current rates of addiction and overdose remain steady.  See Altarum, Solutions to Advance Health: Economic Toll of Opioid Crisis in U.S. Exceeded $1 Trillion Since 2001 (February 13, 2018), retrieved on June 5, 2019 from https://altarum.org/news/economic-toll-opioid-crisis-us-exceeded-1-trillion-2001.

[8]   See National Institute of Drug Addiction, The Science of Drug Use and Addiction: The Basics, retrieved on May 29, 2019 from https://www.drugabuse.gov/publications/media-guide/science-drug-use-addiction-basics; see also, American Society of Addiction Medicine, Public Policy Statement: Definition of Addiction, retrieved on June 13, 2019 from https://www.asam.org/docs/default-source/public-policy-statements/1definition_of_addiction_long_4-11.pdf?sfvrsn=a8f64512_4.

from addiction and reclaim active and meaningful lives.  Clinical laboratory services are recognized as an appropriate and important diagnostic procedure in substance use disorder and mental health treatment as such services promote prevention, diversion, early detection, and lifelong recovery from addiction.  Such testing is designed to provide accurate results that help physicians and treatment clinicians create a scientifically designed drug monitoring strategy for optimal treatment outcomes, which includes testing for accurate prescription therapy and medication assisted treatment.[9]

29.    Families and individuals purchase health insurance to help cover the costs of health care, including the costs of substance use disorder and mental health treatment.  Health insurance is supposed to provide people with peace of mind and security, and provide them with access and options for life-sustaining and life-saving health care while preventing families and individuals from experiencing financial crises, such as bankruptcy or home foreclosure, or being forced to choose between paying for rent, utilities and food or paying for necessary health care costs.

30.    Traditionally, insurers and employers have covered treatment for mental health conditions, including substance use disorders, less favorably than treatment for physical health conditions, including higher cost-sharing obligations for patients, more restrictive limits on the number of inpatient days and outpatient visits, and more onerous prior authorization requirements.  To address this unequal treatment, Congress first passed a mental health parity law in 1996, and many states followed suit in the following decade by passing laws of their own.  Among other limitations, however, the 1996 act did not address the treatment of substance use disorders.  Congress addressed this gap in passing the historic Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA),

---

[9] *See* American Society of Addiction Medicine, Public Policy Statement on Drug Testing as a Component of Addiction Treatment and Monitoring Programs and in other Clinical Settings, retrieved on May 29, 2019 from https://www.asam.org/docs/default-source/public-policy-statements/1drug-testing---clinical-10-10.pdf.

FIRST AMENDED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

42 U.S.C. § 300gg-26, which, among other things, prohibits plans, including those plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, from imposing different treatment limits, cost-sharing and in-network and out-of-network coverage on mental health and substance use disorder treatment than are imposed on other medical and surgical services.[10]  Furthermore, ERISA requires fiduciaries to act solely in the interests of plan participants and beneficiaries, and to decide claims for health care benefits in accordance with plan documents and under a full and fair procedure.

31.     The Patient Protection and Affordable Care Act of 2010 ("PPACA"), 42 U.S.C. §§ 18001, *et seq.*, also known as the Affordable Care Act or Obamacare, requires a range of health plans, both inside and outside of the exchanges, to provide a core package of essential health benefits including mental health and substance use disorder services and laboratory services.  42 U.S.C. § 18022.  The PPACA extends the impact of the MHPAEA so that many health plans must offer coverage for mental health and substance use disorder services and laboratory services with at least an equal level of benefits as the plans offer for the treatment of medical and surgical benefits.  However, as President Donald J. Trump's commission on the opioid crisis wrote in its November 2017 report, "health insurers are not following the federal law requiring parity in the reimbursement for mental health and addiction [;] [t]hey must be held responsible."[11]

---

[10]  California has its own Mental Health Parity Act ("MHPA"), codified in Insurance Code section 10144.5 and Health and Safety Code section 1374.72, which, like the MHPAEA, requires mental health care coverage to be provided "under the same terms and conditions applied to other medical conditions."  California law also requires health care plans to "provide all covered mental health and substance use disorder benefits in compliance with the [MHPAEA] and all rules, regulations, and guidance issued" pursuant to federal laws.  Cal. Ins. Code §§ 10144.4, 10112.27; Cal. Health & Safety Code § 1374.76.

[11]  *See* President's Commission on Combatting Drug Addiction and the Opioid Crisis, Final Report, at pp. 9 and 122, retrieved on May 23, 2019 from https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-15-2017.pdf.  Roster of Commissioners include Governor Chris Christie, Chairman, Governor Charlie Baker, Governor Roy Cooper, Congressman Patrick J. Kennedy, Professor Bertha Madras, Ph.D., Florida Attorney General Pam Bondi.

## **DEFENDANTS' WRONGFUL CONDUCT**

32.     Defendants' wrongful conduct is clear – as is the motive behind it.  In 2014 and 2015, Defendants saw dramatic increases in the number of insureds under its individual PPO PPACA plans.  As disclosed in Defendants' SEC filings, enrollment in individual plans in Defendants' Western Region, which includes California and Arizona, increased 188.7 percent from year-end 2013 to year-end 2014, from approximately 115,000 members to 332,000 members.  In California alone, membership increased 137.0 percent, from approximately 100,000 members to 237,000 members.  According to Defendants, this significant increase was primarily due to an increase in new individual members from the PPACA exchanges in California and Arizona.

33.     Along with this huge increase in the number of insureds, Defendants saw an even more dramatic increase in the number and dollar amount of claims.  In its filings with the CDI, Defendants disclosed that, in 2014, they had earned $233.5 million in premiums for California plans and incurred $345.5 million in claims on those policies.  However, in the following year, 2015, Defendants had earned only $189 million in premiums, but had incurred over $473 million in claims, a loss of $287 million.

34.     In 2016, Defendants found themselves in what the insurance industry calls:  "a Death Spiral."  Defendants were not bringing in enough premiums to cover its claim reserves, and it actuarial projections were fatal.

35.     In July 2016, Defendants were forced to disclose to their shareholders that they had incurred $390 million in liabilities that had not been properly accounted for and disclosed.  At least $140 million of the undisclosed liabilities related to substance abuse claims in California.  This prompted Defendants to seek approval from the CDI to both increase premiums, and to alter policy terms, which changes included reductions in reimbursement rates for out of network providers.

FIRST AMENDED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

36. Defendants requested of the CDI a 23% increase in its 2017 premiums to stay alive. The CDI turned down the request and demanded that Defendants explain themselves.

37. Defendants blamed their mismanagement of the company primarily on the increase in the dollar amount of claims related to the treatment of substance abuse. According to Defendants' CDI filings, its paid substance abuse claims in California increased 1,577% from 2014 to 2015. Out-of-network substance abuse claims alone accounted for 42.7% of all of Defendants' claims in California in 2015, i.e., $202,385,210 out of a total of $473,970,047.

38. Defendants told the CDI that this increase in spending on substance abuse claims was the result of a "coding pitfall" in the way out-of-network substance abuse providers were paid under the new PPACA Plans, that was purportedly fixed for the 2017 coverage year and would by itself resurrect Defendants from their Death Spiral:

> In CY 2015, Out-of-Network substance abuse claims consumed 42.7% of the dollars spend for this block of business. Prior to 2016, Out of network substance abuse claims were paid as a % of billed because a Medicare Allowable rate was not available of this claim category. . .
>
> We have fixed this coding pitfall, which will allow us to establish a reasonable reimbursement rate. This drop in reimbursement rate is expected to reduce OON [out-of-network] substance abuse claims by 80%.

39. In other words, Defendants told the CDI that it could reduce its out-of-network substance abuse claims, totaling $202 million in 2015, by 80% solely by eliminating the provision that paid out-of-network providers 75% of billed charges and reducing that to the 50% of billed charges found in the PPO plans at issue in this action.

40. The dramatic effect of the "coding pitfall" is illustrated by the fact that out-of-network behavioral health claims, which include substance abuse claims, were over 9,000% greater in 2015 than in-network behavioral health claims.

Defendants attributed this difference solely to the fact that out-of-network claims were required to be paid at a percentage of billed charges rather than at a much lower negotiated rate it paid to its in-network providers.

41.     Defendants worked feverishly to control the negative publicity resulting from the required disclosure of corrected financial information.  For instance, on July 26, 2016, during a conference call with numerous financial analysts whose opinions were critical to maintaining Defendants' stock price, CFO Jeffrey Schwaneke, discussing losses resulting from substance abuse treatment claims in California said, "[w]e have taken steps to mitigate the substance abuse treatment center cost in the individual commercial business in California including modifications to plan design," and that Centene was "actively working" with the CDI to "ensure we maintain a competitive individual commercial product in 2017."

42.     CEO Michael Neidorff added in that same analyst call that Defendants were meeting with the California Insurance Commissioner and were "being very aggressive in fixing it." He explained further that Defendants were "working with the state at the highest levels to redesign the PPO product.  There were major flaws in it, and we corrected that.  There's a combination of correcting it and ensuring that it's competitive, ensuring that it attracts a balanced book of business."  Later on during the same conference call, he reiterated that "[t]he issue is the certificates of coverage and they are being changed for 2017," so that "the behavioral issue is being dealt with with [sic] the benefit designs."  Mr. Neidorff explained that the Defendants' PPO plans had "product design issues," but insisted "we're bringing the product design in line."  Referring again to the discussions with CDI regarding the PPO redesign, he said "[w]e're closing – I don't want to call it loopholes – some openings that the state understands."

43.     Moreover, on July 28, 2016, during an appearance on the CNBC show, "Mad Money," Mr. Neidorff responded to a question regarding losses in Defendants' California business by stating, "we have an issue there, we're working

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COMPLAINT

very closely with the Department of Insurance … that the individual PPO had a bad product design.  And we knew that, and we've already submitted the changes, effective January 1 of '17.  They're gonna be fully approved, so it's a competitive product."

44.     Further, during another analyst call on October 23, 2016, Mr. Neidorff returned to the issue of the design flaws in Defendants' individual PPO plans and their efforts to fix them.  He detailed some of the key changes, including "the first time inclusion of an out-of-network deductible for platinum and gold plans," a "significant increase in the out-of-network maximum out-of-pocket level," the "elimination of non-emergent out-of-state coverage and travel network access," the "elimination of the default rate of 75% of billed charges to out-of-network services that do not have a Medicare rate," and "restrictions on third-party premium payments, which were not included in the original 2016 offering." Mr. Neidorff said, "[t]he previous design I would almost characterize as an inexpensive indemnity-type product. And it was a loss for Health Net in 2015 as well, we knew that."

45.     Speaking further about Defendants' PPO plan prior to 2017, Mr. Neidorff said, "when you look at all the products associated with it, the out-of-network coverage, the benefit design they had before without the Medicare Maximum and the other issues where there was a percent of billed charges, basically out-of-network providers could do what they wanted and we are liable at a time for 75% of billed charges 'til they change their certificate of coverage.  So, virtually putting in the changes that I discussed during my formal remarks eliminates the incentives to put people into that product at the same level. …  It was a bad design before.  The state, everybody recognized it.  It's been fully fixed."

46.     In addition, at the Morgan Stanley Global Health Care Conference on September 13, 2016, Mr. Neidorff stated that Defendants had "dealt with" its losses and liabilities for substance abuse treatment claims in California by "chang[ing] the

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

benefit level," and said it was working with the CDI to "fix the PPO in California." He added, "[t]here were some design flaws that were just so obvious to those of us who have been doing it for a long time.  Those have been fixed.  The Commissioner has asked to meet as early as this week to try and finalize things . . .  If not, we will do it early next week."  Mr. Neidorff went on to explain some of the "design flaws" in the PPO plans that had led to substance abuse treatment claim liability:

> There were not the incentives. A PPO is designed to give people an option to go out of network, but really it should be designed to encourage people to stay in network. This had none of that. There were no caps on maximum allowances. We had the most liberal -- or Health Net had the most liberal PPO out there, which encouraged adverse selection. We knew that when we bought the company. We had done our homework
>
> But we knew we had the prior purchase accounting methodology to deal with it.  And we knew what it would take to fix it. And that's just what we have been doing, very methodically. And we're very comfortable. The deductibles will be $5,000 and $10,000, from no deductible. You do things so people will use the in-network. It will be a very competitive -- if we get the changes we want, we will be able to do it with virtually no rate increase.  And it shows you the order of magnitude

47.    In 2017, Defendants began a systematic campaign to resolve the problem relating to their unprofitable PPO policies.  Rather than accept the losses which occurred as the result of their own acknowledged Plan design flaws, Defendants instead chose to resolve their own financial issues by arbitrarily reducing or eliminating entirely all payments to out-of-network substance abuse providers in California.  The reduction or elimination of benefit payments was not limited to Plaintiffs, but was a uniform practice put in place by Defendants that impacted claims submitted by over 1,000 California substance abuse treatment centers.

48.    Defendants and each of them denied, delayed and incorrectly issued payment for Plaintiffs' claims even after records were repeatedly copied, sent and received by and at the request of Defendants.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COMPLAINT

49.     Defendants and each of them would respond to Plaintiffs' inquiries about the delay or errors in payment with a multitude of excuses, including further requests for information, or that the claims had cleared their Special Investigations Unit ("SIU") and had been placed in the queue for payment, or that the claims had been referred for a quality assurance review.  Regardless of the excuses made by Defendants and each of them, Plaintiffs did not receive proper claim payments for drug and alcohol treatment.

50.     In putting its fraudulent scheme into effect, HNI alleged that the act of treatment providers waiving the patients' deductibles, copayments or co-insurance could raise questions regarding false or fraudulent claims.  However, HNI's PPACA Plans were *coinsurance only policies* in which deductible and copayments are not applicable for out-of-network services.  It is impossible for treatment providers to determine (or waive) co-insurance amounts until a claim is paid.  Nevertheless, Defendants predicated an investigation of fraud involving waiver of co-insurance amounts on claims that had not yet been paid.

51.     Defendants also developed a scheme to conceal its under-reserved substance abuse treatment claims by introducing Claims Operations User's Manual 2015-2016 Facility Behavioral Health Services for PPO Products Only, P&P 16-0014.  The pertinent sections of this manual provided instruction that Behavioral Health Services (aka substance abuse treatment) claims would be "dropped into a special queue to be worked."  The substance abuse treatment claims were to be sent through a procedure initiated by the manual, (P&P 16-0014) which placed substance abuse treatment claims in a classic "catch 22" scenario.  Whatever information was provided by the provider went through an impossible and rigged "if- then" chart that inevitably led to denial of the claims.  If compliant medical records and authorization accompanied the claim, the claims associate was to check the "provider notes" to see if the provider had been removed from the SIU audit.  This means that all California substance abuse providers were automatically included on

FIRST AMENDED COMPLAINT

the SIU audit list at its inception despite the existence or non-existence of any information or evidence justifying their inclusion on the list. It was then up to the individual substance abuse treatment provider to prove to Defendants that they should be removed from the list. In essence, they were being asked to prove a negative, which was that they had not acted fraudulently. Each of the substance abuse treatment providers placed on the SIU list by Defendants had been deemed "guilty until proven innocent." Even if the provider had been removed from the audit list, the substance use disorder claim was still to be referred to the SIU, and the subject line of the transmittal was to indicate, "behavioral health."

52.     In May and June 2016, Defendants made significant revisions to P&P 16-0014. Specifically, the revisions added instructions to "not pay [substance abuse] claims at 75% of billed charges," and to instead use the "Medicare percent conversion factor." Neither members nor providers were given notice of these changes in the processing of claims. Once again, not paying the stated reimbursement rate and using the Medicare rate was nothing more than a component of Defendants' fraudulent scheme to retroactively resolve its financial problems created by its own acknowledged "plan design flaws."

53.     Defendants and each of them, developed a mechanism through the SIU audit and their superior economic might to oppress treatment centers, including Plaintiffs, forcing Plaintiffs into a position where they can no longer afford to accept patients insured by Defendants, and resulting in significant and undue hardship to Plaintiffs, and interference with Plaintiffs' contractual relationships with their patients and their prospective economic advantage.

54.     The CDI has seen through Defendants' scheme. On June 23, 2017, the CDI issued an Order to Show Case ("OSC") to Defendants, stating that it had received hundreds of complaints from out-of-network substance abuse providers about Defendants' handling of claims for treatment of their insureds. The OSC alleges that Defendants' refusal to honor the plan language, requiring

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1   reimbursement at the stated percentage of billed charges (formerly 75%, now 50%

2   of billed charges) evidence unfair claims practices, violations of the Mental Health

3   Parity Act, and unfair and/or deceptive act of practices in violation of California

4   Insurance Code Section 790.03.

5       55.     On July 24, 2018, the California CDI issued a second OSC against

6   Defendants, again alleging that their conduct in refusing to honor the plan language

7   violates the law.  The CDI specifically noted that "Health Net's liability [for the

8   billed charges] under the terms of the policy was reasonably clear," yet Defendants

9   "fail[ed] to adopt and implement reasonable standards for the prompt investigation

10  and processing of claims arising under its insurance policies, …fail[ed] to attempt in

11  good faith to effectuate prompt, fair and equitable settlement of claims in which

12  liability had become reasonably clear, …[and] fail[ed] to conduct and diligently

13  pursue a thorough, fair and objective investigation, and of persisting in seeking

14  information not reasonably required for or material to the resolution of a claim

15  dispute."  The CDI specifically found that "Health Net has engaged in acts which

16  constitute an unfair method of competition and/or unfair or deceptive acts or

17  practices in this State."  The California CDI has added that Health Net's referral of

18  all claims to its SIU unit "directly upon receipt of the claims payment request, prior

19  to performing a reasonable review of the claim" and placing providers "on an audit

20  list and then require[ing them] to prove that they should be removed from the list

21  before any payment was made" "resulted in illegitimate denials and delayed

22  payment of claims" and "is an unreasonable standard for the investigation and

23  processing of claims."  A true and correct copy of the July 24, 2018, OSC is

24  attached hereto as **Exhibit A**.

25          **DEFENDANTS' SCHEME SPECIFIC TO PLAINTIFFS**

26  **VRC**

27      56.     VRC is an out-of-network substance use disorder treatment provider.

28  VRC provides treatment and services to individuals in the process of recovering

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COMPLAINT

from substance use disorders.  VRC provided medically necessary, verified, preauthorized and covered substance use disorder treatment and laboratory services to 14 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by VRC include RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services.

57.   Defendants' health insurance plans, for each of the 14 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

58.   Defendants' health insurance plans, for each of the 14 insureds at issue, pay benefits for out-of-network substance use disorder treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, counseling and behavioral therapies, case management services, at 50% of covered charges until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  VRC is informed and believes, and based thereon alleges, that each of the 14 insureds had already met their annual out-of-pocket maximum at the time of admission into VRC's program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  VRC is informed and believes, and based thereon alleges, that at

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1  all times relevant herein Defendants had an inadequate network of substance use

2  disorder treatment providers and clinical laboratories.

3          59.    VRC obtained an oral and written assignment of benefits from each of

4  the 14 insureds at issue, by which Defendants' insureds intended to, and did, assign

5  to VRC not only rights to payment of claims but to assert all rights and causes of

6  action against Defendants in connection with such claims.  In reliance on the

7  assignments of benefits, VRC rendered the subject treatment and services to

8  Defendants' insureds/members.  Moreover, Defendants confirmed, represented,

9  promised and warranted to VRC through the required verification of benefits and the

10  preauthorization process, that each of the insureds and their respective out-of-

11  network treatments and services were covered by health insurance plans issued,

12  managed and/or administered by Defendants and that VRC would be properly paid

13  for treating Defendants' insureds/members.  In reliance on Defendants' coverage

14  representations and payment promises, VRC rendered the subject treatment and

15  services to Defendants' insureds/members.  At all times relevant herein, Defendants

16  knew that VRC was treating, and would continue to treat, their insureds, and

17  Defendants were, at all times, fully aware of VRC's charges for the treatment and

18  services rendered.

19          60.    After providing covered treatment and services to the 14 insureds at

20  issue, VRC submitted its claims to Defendants for payment.  Defendants were

21  obligated – under the law and the policies – to pay VRC the applicable plan

22  percentage of its covered charges (50% of covered charges) until the insured's

23  nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

24  Defendants also advised, confirmed and promised to VRC during the verification of

25  benefits and preauthorization process for each of the 14 insureds, that the out-of-

26  network benefits paid by Defendants to out-of-network providers, like VRC, for all

27  levels of substance use disorder treatment and laboratory services, is a percentage of

28  its covered charges (50% of covered charges) until the insured's nominal annual

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 22 -

FIRST AMENDED COMPLAINT

out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying VRC per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to VRC, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid VRC a mere *0.02%* of its covered charges – specifically Defendants paid $312.75 of the $2,045,920.10 in covered charges.  It was only after VRC rendered the treatment and services at issue that Defendants refused to properly compensate VRC for the covered treatment and services rendered to Defendants' insureds.  Defendants maintained their refusal to properly compensate VRC for the covered treatment and services rendered to Defendants' insureds despite continuing to make promises of forthcoming payment to the contrary even after the treatment and services had been rendered.

61.    During the claim submission and payment process, Defendants put VRC on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from VRC, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  VRC complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse VRC for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide VRC and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide VRC and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair. Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 23 -

FIRST AMENDED COMPLAINT

1    document and information requests and promises of payment were false and

2    fraudulent and were implemented by Defendants, and each of them, as a pretext to

3    illegally delay and deny VRC (and hundreds of other substance use disorder

4    treatment providers and clinical laboratories) payment in accordance with

5    Defendants' representations and promises, and the law and plans.

6         62.    As a result, VRC has suffered and continues to suffer general and

7    incidental damages according to proof, including the benefits owed under the plans

8    and the law in the millions, amounts owed in accordance with Defendants' payment

9    promises to VRC, the interruption in VRC's business, lost business opportunities,

10   lost profits and other consequences, and moreover, VRC is entitled to injunctive

11   relief and statutory and prejudgment interest and attorney's fees against Defendants,

12   and each of them.

13        **Hillside**

14        63.    Hillside is an out-of-network substance use disorder treatment provider

15   and clinical laboratory.  Hillside provides treatment and services to individuals in

16   the process of recovering from substance use disorders.  Hillside provided medically

17   necessary, verified, preauthorized and covered substance use disorder treatment and

18   laboratory services to 2 individuals with health insurance that was sold, insured,

19   managed and/or administered by Defendants.  The treatment and services provided

20   by Hillside include RTC, PHP, IOP, OP, treatment planning, counseling and

21   behavioral therapies, and case management services.

22        64.    Defendants' health insurance plans, for each of the 2 insureds at issue,

23   provide coverage for out-of-network substance use disorder treatment and

24   laboratory services.  In this regard, the plans, and each of them, provide that out-of-

25   network substance use disorder benefits include the following levels of care: RTC,

26   PHP, IOP, and OP.  The plans also provide that covered out-of-network substance

27   use disorder services include: diagnostic evaluations, assessment and treatment

28   planning, treatment and/or procedures, medication management and other associated

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 24 -
FIRST AMENDED COMPLAINT

1  treatment, psychological testing, referral services, individual, family and group

2  therapy, provider-based case management services, and crisis intervention.  The

3  plans further provide coverage for out-of-network laboratory benefits, which include

4  the facility charge and the charge for supplies and equipment, physician services for

5  pathologists, and presumptive drug tests and definitive drug tests.

6      65.    Defendants' health insurance plans, for each of the 2 insureds at issue,

7  pay benefits for out-of-network substance use disorder treatment and laboratory

8  services, including, but not limited to, RTC, PHP, IOP, OP, counseling and

9  behavioral therapies, and case management services, at 50% of covered charges

10  until the insured's nominal annual out-of-pocket maximum is met at which time

11  Defendants pay 100%.  Hillside is informed and believes, and based thereon alleges,

12  that each of the 2 insureds had already met their annual out-of-pocket maximum at

13  the time of admission into Hillside's program, or shortly thereafter.  The plans also

14  pay 100% of covered charges in the event of a "network inadequacy" or "network

15  gap" for the services received.  Hillside is informed and believes, and based thereon

16  alleges, that at all times relevant herein Defendants had an inadequate network of

17  substance use disorder treatment providers and clinical laboratories.

18      66.    Hillside obtained an oral and written assignment of benefits from each

19  of the 2 insureds at issue, by which Defendants' insureds intended to, and did,

20  assign to Hillside not only rights to payment of claims but to assert all rights and

21  causes of action against Defendants in connection with such claims.  In reliance on

22  the assignments of benefits, Hillside rendered the subject treatment and services to

23  Defendants' insureds/members.  Moreover, Defendants confirmed, represented,

24  promised and warranted to Hillside through the required verification of benefits and

25  the preauthorization process, that each of the insureds and their respective out-of-

26  network treatments and services were covered by health insurance plans issued,

27  managed and/or administered by Defendants and that Hillside would be properly

28  paid for treating Defendants' insureds/members.  In reliance on Defendants'

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1    coverage representations and payment promises, Hillside rendered the subject

2    treatment and services to Defendants' insureds/members.  At all times relevant

3    herein, Defendants knew that Hillside was treating, and would continue to treat,

4    their insureds, and Defendants were, at all times, fully aware of Hillside's charges

5    for the treatment and services rendered.

6            67.    After providing covered treatment and services to the 2 insureds at

7    issue, Hillside submitted its claims to Defendants for payment.  Defendants were

8    obligated – under the law and the policies – to pay Hillside the applicable plan

9    percentage of its covered charges (50% of covered charges) until the insured's

10   nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

11   Defendants also advised, confirmed and promised to Hillside during the verification

12   and benefits and preauthorization process for each of the 2 insureds, that the out-of-

13   network benefits paid by Defendants to out-of-network providers, like Hillside, for

14   all levels of substance use disorder treatment, is a percentage of its covered charges

15   (50% of covered charges) until the insured's nominal annual out-of-pocket

16   maximum is met at which time Defendants pay 100%.  Instead of paying Hillside

17   per the plan documents and the law, and in accordance with Defendants'

18   agreements, representations and promises to Hillside, Defendants engaged in unfair,

19   unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and

20   decisions – with an emphasis on profits over patients – Defendants did not pay

21   Hillside *anything* – specifically, Defendants paid $0.00 of the $281,049.00 in

22   covered charges.  It was only after Hillside rendered the treatment and services at

23   issue that Defendants refused to properly compensate Hillside for the covered

24   treatment and services rendered to Defendants' insureds.  Defendants maintained

25   their refusal to properly compensate Hillside for the covered treatment and services

26   rendered to Defendants' insureds despite continuing to make promises of

27   forthcoming payment to the contrary even after the treatment and services had been

28   rendered.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 26 -

68.     During the claim submission and payment process, Defendants put Hillside on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Hillside, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  Hillside complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse Hillside for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide Hillside and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Hillside and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Hillside (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

69.     As a result, Hillside has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to Hillside, the interruption in Hillside's business, lost business opportunities, lost profits and other consequences, and moreover, Hillside is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

**Sheer Recovery**

70.     Sheer Recovery is an out-of-network substance use disorder treatment provider and clinical laboratory.  Sheer Recovery provides treatment and services to individuals in the process of recovering from substance use disorders.  Sheer Recovery provided medically necessary, verified, preauthorized and covered substance use disorder treatment and laboratory services to 11 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by Sheer Recovery include RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services.

71.     Defendants' health insurance plans, for each of the 11 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

72.     Defendants' health insurance plans, for each of the 11 insureds at issue, pay benefits for out-of-network substance use disorder treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, counseling and behavioral therapies, and case management services, at 50% of covered charges until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Sheer Recovery is informed and believes, and based thereon

alleges, that each of the 11 insureds had already met their annual out-of-pocket maximum at the time of admission into Sheer Recovery's program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  Sheer Recovery is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers and clinical laboratories.

73.     Sheer Recovery obtained an oral and written assignment of benefits from each of the 11 insureds at issue, by which Defendants' insureds intended to, and did, assign to Sheer Recovery not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims. In reliance on the assignments of benefits, Sheer Recovery rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to Sheer Recovery through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that Sheer Recovery would be properly paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, Sheer Recovery rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that Sheer Recovery was treating, and would continue to treat, their insureds, and Defendants were, at all times, fully aware of Sheer Recovery's charges for the treatment and services rendered.

74.     After providing covered treatment and services to the 11 insureds at issue, Sheer Recovery submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay Sheer Recovery the applicable plan percentage of its covered charges (50% of covered charges) until the

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COMPLAINT

insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to Sheer Recovery during the verification and benefits and preauthorization process for each of the 11 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like Sheer Recovery, for all levels of substance use disorder treatment, is a percentage of its covered charges (50% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Instead of paying Sheer Recovery per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to Sheer Recovery, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Sheer Recovery a mere *5.68%* of its covered charges – specifically, Defendants paid $51,397.97 of the $905,450.00 in covered charges. It was only after Sheer Recovery rendered the treatment and services at issue that Defendants refused to properly compensate Sheer Recovery for the covered treatment and services rendered to Defendants' insureds. Defendants maintained their refusal to properly compensate Sheer Recovery for the covered treatment and services rendered to Defendants' insureds despite continuing to make promises of forthcoming payment to the contrary even after the treatment and services had been rendered.

75.     During the claim submission and payment process, Defendants put Sheer Recovery on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Sheer Recovery, over and over again. This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims. Sheer Recovery complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse Sheer

FIRST AMENDED COMPLAINT

1   Recovery for the covered treatment and services provided to Defendants' insureds.

2   Defendants likewise failed and refused to provide Sheer Recovery and the insureds

3   with adequate notice and/or explanation for the denial of benefits, payments or

4   reimbursement of claims, and failed and refused to provide Sheer Recovery and the

5   insureds with a reasonable opportunity to engage in a meaningful claims process and

6   procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending

7   of claims, inadequate notices and explanations, denial of full and fair claims

8   processes and procedures, repetitive document and information requests and

9   promises of payment were false and fraudulent and were implemented by

10  Defendants, and each of them, as a pretext to illegally delay and deny Sheer

11  Recovery (and hundreds of other substance use disorder treatment providers and

12  clinical laboratories) payment in accordance with Defendants' representations and

13  promises, and the law and plans.

14      76.    As a result, Sheer Recovery has suffered and continues to suffer

15  general and incidental damages according to proof, including the benefits owed

16  under the plans and the law in the millions, amounts owed in accordance with

17  Defendants' payment promises to Sheer Recovery, the interruption in Sheer

18  Recovery's business, lost business opportunities, lost profits and other

19  consequences, and moreover, Sheer Recovery is entitled to injunctive relief and

20  statutory and prejudgment interest and attorney's fees against Defendants, and each

21  of them.

22  **LEGAL EFFECT AND CONSEQUENCES OF DEFENDANTS' SCHEME**

23      77.    Defendants' conduct at issue herein has had a severe and adverse effect

24  on not only Plaintiffs, but also Defendants' insureds and the substance use disorder

25  treatment profession as a whole.  Defendants' conduct has placed the lives of their

26  insureds that are struggling with addiction in jeopardy, exposing the insureds and

27  their families to significant financial and health risk, while simultaneously

28  destroying or significantly damaging Plaintiffs and all similarly situated substance

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1   use disorder treatment providers and clinical laboratories.

2       78.    Defendants' conduct breached agreements with Plaintiffs which arose

3   when Plaintiffs' patients assigned benefits to Plaintiffs in writing, and when

4   Defendants confirmed out-of-network coverage and promised payment to Plaintiffs,

5   and when necessary, Defendants gave prior approval for the substance use disorder

6   treatment and services that Plaintiffs provided to Defendants' insureds/members.

7   Defendants' violated the implied covenant of good faith and fair dealing in said

8   insurance contracts, rendering their actions in "bad faith."

9       79.    Upon information and belief, Plaintiffs allege that Defendants' conduct

10  was wanton and willful, and undertaken to improve their balance sheets by placing

11  profits over patients in a life and death situation.  In this regard, Defendants'

12  substance use disorder treatment and related clinical laboratory guidelines,

13  reimbursement policies and claims handlings processes and procedures were, and

14  are, fraudulently flawed and tainted by Defendants' financial interests.

15      80.    Defendants' practices were also unfair, fraudulent and unlawful under

16  California's Unfair Competition Law ("UCL") in that, as a part of their scheme to

17  not pay or underpay Plaintiffs, and to prevent Plaintiffs from learning of

18  Defendants' scheme for as long as possible, Defendants violated their claims

19  handling obligations under ERISA and California law by providing either no,

20  baseless, false, or dilatory reasons for not paying or underpaying Plaintiffs.

21  Plaintiffs are therefore entitled to injunctive relief and restitution under the UCL.

22      81.    Defendants' practices were similarly unfair, fraudulent and unlawful

23  under state and federal law in that they violate the MHPAEA, while simultaneously

24  constituting common law bad faith.  The MHPAEA is an antidiscrimination statute

25  intended to ensure that coverage of mental health and substance use disorder

26  treatment (such as Plaintiffs provide) is in "parity" with coverage of medical and

27  surgical care.  Defendants, and each of them, have systematically treated substance

28  use disorder treatment providers differently than medical and surgical providers in

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COMPLAINT

1    California, and likely across the nation.

2        82.    Defendants' practices were likewise unfair, fraudulent and unlawful

3    under state and federal law in that they violate the PPACA, which requires, among

4    other things, insurers to provide benefits for essential mental health and substance

5    use disorder treatment and laboratory services, with no pre-existing condition

6    exclusions and no annual or lifetime dollar amount limits on coverage of such

7    treatment services.

8        83.    Defendants' actions were further unfair, fraudulent and unlawful in that

9    they violated other well established public policies, including those set forth in the

10   California Unfair Insurance Practices Act ("UIPA"), as set forth in California

11   Insurance Code sections 790, *et seq*.

12       84.    Defendants' insureds/members were also unlawfully, unfairly and

13   fraudulently misled into believing that their health plans would provide coverage for

14   care supplied by out-of-network substance use disorder treatment providers and

15   clinical laboratories, such as Plaintiffs.

16       85.    Defendants, and each of them, never intended to provide the coverage

17   mandated by the plans at issue and instead intended to not pay or to underpay

18   substance use disorder treatment providers and laboratories throughout California,

19   including Plaintiffs.  Defendants, and each of them, have ignored Plaintiffs' efforts

20   to recover payment for the treatment and services provided, placing Plaintiffs in the

21   untenable position of being forced to file this lawsuit in order to recover payments

22   due under the law and plans, and in accordance with Defendants' out-of-network

23   coverage representations and payment promises to Plaintiffs.

24       86.    Plaintiffs seek relief under their direct rights, written assigned rights

25   from patients cheated out of their insurance benefits by Defendants, and as third-

26   party beneficiaries of their patients' health insurance plans issued, managed and/or

27   administered by Defendants.

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

87.     Defendants have also tortiously breached the implied covenant of good faith and fair dealing in the underlying health insurance plans issued, managed and/or administered by Defendants, which rights have been assigned to Plaintiffs.

88.     The treatment and services at issue were provided by Plaintiffs to patients who at all relevant times had health insurance for the substance use disorder treatment and services that Plaintiffs provided and the health insurance plans were issued, managed and/or administered by Defendants, and each of them, or at the direction and under the control of Defendants.

89.     Defendants, and each of them, caused the events complained of herein to occur in the County of Los Angeles and throughout the State of California, and likely across the nation.

90.     Plaintiffs provide substance use disorder treatment to individuals in the process of recovering from alcoholism and substance use disorders.  Plaintiffs' treatment includes a range of services, including, but not limited to, RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

91.     Defendants, and each of them, developed and marketed the subject health insurance plans to include coverage for substance use disorder treatment provided to their insureds by in-network providers and out-of-network providers like Plaintiffs.

92.     The health insurance plans issued, managed and/or administered by Defendants, and each of them, are industry standard indemnity health insurance contracts that provide richer benefits (less out-of-pocket expense for insureds) for treatment and services that are obtained from in-network providers.  Such providers contract with Defendants to become part of their "network" and generally agree to accept a set reduced rate of reimbursement in exchange for steerage of patients to

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

their practices or facilities and payment within specified contractual timeframes.

93.     The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide for a reimbursement rate for out-of-network services at a lesser percentage of the overall billed charges than the 100% reimbursement rate for in-network services, less the insured's copayment, coinsurance and deductible, generally resulting in greater out-of-pocket expenses for Defendants' insureds.

94.     California law requires that the policy forms, such as those utilized in the health insurance plans issued, managed and/or administered by Defendants, and each of them, be filed with and approved by the CDI, and are generally not to be withdrawn from the insurance marketplace without an insurer meeting specific conditions.

95.     The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide coverage for, but not limited to, the following out-of-network substance use disorder treatment and services: RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

96.     The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide for the payment of services with in-network providers at 100% of the provider's billed charges set by contract, less the insured's copayment, coinsurance and deductible.  Services with out-of-network providers are reimbursed at a lesser percentage of the provider's billed charges (50% in this case).

97.     The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide that Defendants are required to remit claim payments directly to providers when the insured assigns his or her benefits to the

provider in writing, and Defendants promised Plaintiffs that payments would be made directly to Plaintiffs.

98.     When required by the health insurance plans issued, managed and/or administered by Defendants, and each of them, Plaintiffs' standard operating procedure was to obtain prior authorizations from Defendants for the substance use disorder treatment and services to be rendered.  Plaintiffs' standard operating procedure also included obtaining a verification of benefits from Defendants to ensure the patient is covered by the insurer and that the treatment and services are covered benefits under the plan.

99.     In communication with Plaintiffs, including telephone calls requesting verification of benefits and preauthorization, Defendants, and each of them, represented to Plaintiffs that the services provided to Defendants' insureds were covered and that the out-of-network benefits paid by Defendants to out-of-network providers, like Plaintiffs, for all levels of substance use disorder treatment, is a percentage of its covered charges (here, 50% covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

100.    Specifically, for each of the 27 patients whose treatments are at issue, Plaintiffs contacted Defendants by phone and/or in writing before beginning such treatments.  Plaintiffs learned that the patients were validly covered by their plans with Defendants, and Plaintiffs informed Defendants of the proposed out-of-network treatments of Defendants' insureds, including the specific services to be provided and the billing codes for the same.  Defendants' represented, warranted and promised to Plaintiffs that the out-of-network benefits paid by Defendants to out-of-network providers, like Plaintiffs, for all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (here, 50% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Thereafter, Plaintiffs treated and provided services to Defendants' insureds/members.

FIRST AMENDED COMPLAINT

101.    Based upon the language of the health insurance plans issued, managed and/or administered by Defendants, and each of them, and upon obtaining verifications of benefits and prior authorizations from Defendants, and valid written assignments, Plaintiffs and their patients insureds by Defendants, all 27 of them, reasonably expected that Plaintiffs' claims would be paid promptly and consistent with the law and the terms of the plans and/or the herein payment representations and promises that Defendants, and each of them, made to Plaintiffs.

102.    Notwithstanding the verifications of benefits, prior authorizations, coverage representations by Defendants, payment promises by Defendants, and valid written assignments, Plaintiffs' claims for the majority of the substance use disorder treatment and laboratory services provided to Defendants' insureds/members have not been paid properly and require substantial interest payments for violation of the applicable health plans, ERISA and California insurance laws and regulations providing for the prompt payment of claims.

103.    Plaintiffs are entitled to payment for the substance use disorder treatment and services provided to Defendants' insureds/members at the proper reimbursement rates, pursuant to valid written assignments from their patients and pursuant to Defendants' coverage representations and payment promises to Plaintiffs.

104.    While the breaches alleged herein involved health insurance plans issued, managed and/or administered by one or more of the Defendants and Defendants' coverage representations and payment promises to Plaintiffs, each Defendant, upon information and belief, conceived, directed, approved, or aided and abetted the others in this bad faith scheme.

105.    In California, a health insurer must provide or arrange for the provision of access to health care services in a timely manner.  Most health insurers, including Defendants, and each of them, seek to satisfy this duty by providing an adequate network of providers for their insureds to choose from so they may receive the

- 37 -

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

necessary treatment at the lowest expense to the insurer and the insured.

106.   A "network gap" or "network insufficiency" exists in a health insurer's network when either the health insurer, or the patient, is unable to secure the services of an in-network provider for necessary treatment.  If a network gap exists, California law requires the insurer to secure the services of an out-of-network provider so the insurer can meet its legal and contractual obligations to provide or arrange for the provision of access to health care services in a timely manner.  In addition, emergency services, and sometimes urgently needed services, must be covered by an insurer with an out-of-network provider if the insurer has no network provider to provide the needed services.

107.   California law does not give a health insurer the right or ability to unilaterally set the price it will pay an out-of-network provider that provides services to one of the insurer's insureds in order to fill a network gap.

108.   Upon information and belief, there was a network gap with respect to substance use disorder treatment providers and laboratories in California to serve the tremendous number of insured patients in need of such treatment and services, due in large part to the opioid and addiction epidemic in California, and across the nation.

109.   Upon information and belief, there was a network gap with respect to substance use disorder treatment providers and laboratories required to treat Defendants' insureds/members, which caused some of Defendants' insureds to obtain their needed treatment and services with Plaintiffs, out-of-network providers.

110.   In the health care industry, a "verification" of an insured's coverage for the contemplated treatment, or an "authorization" for such treatment, is understood by both the insurers and providers to be an agreement by the insurers to pay for such treatment.  For in-network providers, it is an agreement by the insurers to pay those providers based on previously negotiated rates between the insurer and those providers.  For out-of-network providers, it is an agreement by the insurers to pay

FIRST AMENDED COMPLAINT

those providers at their fully billed charges.

111.   Plaintiffs, as out-of-network providers, after obtaining verifications of benefits and prior authorizations from Defendants, provided life-saving and medically necessary substance use disorder treatment and services to Defendants' insureds/members due to a network gap and are therefore entitled to recover payment for their treatment and services at their fully billed charges.

112.   While Plaintiffs have repeatedly demanded payment in full for the treatment and services provided to Defendants' insureds, Defendants, and each of them, have denied, delayed and incorrectly issued payment for Plaintiffs' claims even after requested records were copied, sent and received by Defendants.

113.   Defendants, and each of them, would respond to Plaintiffs' inquiries about the delay or errors in payment with false promises that payment would be made and/or a multitude of excuses.  Regardless of the excuses made by Defendants, and each of them, Plaintiffs did not receive proper claim payments for the covered substance use disorder treatment and services provided to Defendants' insureds/members.

114.   Upon information and belief, Defendants, and each of them, realized an immediate positive financial impact as a result of their misconduct alleged herein, cessation of substance use disorder treatment and laboratory claims payments, and forcing treatment providers, like Plaintiffs, through an expensive, administratively burdensome and indiscriminate audit, and not paying claims that are due and owed.

115.   Upon information and belief, Defendants, and each of them, undertook the actions alleged herein with the intent and designed purpose of not paying claims that are due and owed under the law and the plans, and in accordance with Defendants' coverage representations and payment promised to Plaintiffs, as part of a pattern and practice by Defendants, and each of them, that is unlawful, unfair and fraudulent, and thus violates, *inter alia*, California's UCL, state and federal regulations and ERISA, MHPAEA and PPACA.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COMPLAINT

116.   Upon information and belief, Defendants, and each of them, undertook the actions alleged herein, in violation of numerous provisions of California's UIPA, without limitation, numerous subsections of California Insurance Code section 790.03, including misrepresentations to patients and providers, failing to acknowledge and act reasonably and promptly in response to communications, failing to adopt and implement reasonable standards for investigations, not attempting in good faith to effectuate prompt, fair and equitable settlement of claims, and compelling providers, like Plaintiffs, to institute litigation to recover amounts due and owed.

117.   Upon information and belief, Defendants, and each of them, developed a mechanism through their superior economic might to oppress substance use disorder treatment providers and laboratories, including Plaintiffs, forcing Plaintiffs and other treatment providers into a position where they can no longer afford to accept patients insured by Defendants, our with health plans managed and/or administered by Defendants, and resulting in significant and undue hardship to Plaintiffs (and the patient-insureds) and interference with Plaintiffs' contractual relationships with their patients and their prospective economic advantage.  And Defendants, and each of them, are doing this in the middle of an opioid and addiction epidemic!

## FIRST CAUSE OF ACTION

### Claims for Plan Benefits Under ERISA, 29 U.S.C. §1132(a)(1)(B)

### Against All Defendants

118.   Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

119.   Plaintiffs are out-of-network substance use disorder treatment providers and clinical laboratories.  Plaintiffs are in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  Plaintiffs provided medically

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

necessary, verified, preauthorized and covered substance use disorder treatment and laboratory services to 27 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by Plaintiffs include RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, individual, family and group therapy, medication management, case management services, and laboratory services to, among other things, determine, measure, or otherwise describe the presence or absence of various substances in the body.

120.   Defendants' ERISA health insurance plans, for each of the 27 insureds at issue who had ERISA plans, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the ERISA plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that out-of-network covered substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

121.   Plaintiffs allege this claim for relief in connection with their claims for substance use disorder treatment and laboratory services rendered to the 27 insureds with a health benefits plan governed by ERISA.  This claim seeks to recover benefits, enforce rights and clarify rights to benefits under 29 U.S.C. § 1132(a)(1)(B).  Plaintiffs have standing to pursue these claims as assignees of the insureds' benefits under the ERISA plans.  Defendants' insureds orally assigned benefits by their insurance company or health plan to Plaintiffs and Plaintiffs

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1  obtained written assignments of benefits from the insureds at issue, by which

2  Defendants' insureds intended to, and did, assign to Plaintiffs not only rights to

3  payment of claims but to assert all rights and causes of action against Defendants in

4  connection with such claims.  As the assignees of benefits under the ERISA plans,

5  Plaintiffs are beneficiaries entitled to collect benefits under the terms of the ERISA

6  plans, and claimants for purposes of ERISA.

7      122.   Defendants' health plans governed by ERISA pay benefits for out-of-

8  network substance use disorder treatment and laboratory services, including, but not

9  limited to, RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment

10  planning, treatment and/or procedures, medication management and other associated

11  treatment, psychological testing, referral services, individual, family and group

12  therapy, provider-based case management services, crisis intervention and

13  laboratory services at varying percentages of covered charges (50% of covered

14  charges) until the insured's nominal annual out-of-pocket maximum is met at which

15  time Defendants pay 100%.  Plaintiffs are informed and believe, and based thereon

16  allege, that each of the 27 insureds at issue had already met their annual out-of-

17  pocket maximum at the time they first received services from Plaintiffs, or shortly

18  thereafter.  The ERISA plans also pay 100% of covered charges in the event of a

19  "network inadequacy" or "network gap" for the services received.  Plaintiffs are

20  informed and believe, and based thereon allege, that at all times relevant herein

21  Defendants had an inadequate network of substance use disorder treatment providers

22  and clinical laboratories.

23      123.   The intended benefits set forth in Defendants' ERISA health plans are

24  the same in all material respects as to the claims at issue for those of Defendants'

25  508 insureds with a health benefits plan governed by ERISA, and provide the

26  following material terms with respect to coverage for the services at issue:

27          Covered Services and Supplies means Medically
             Necessary services and supplies that are payable or
28           eligible for reimbursement, subject to any Deductibles,

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Copayments, Coinsurance, benefit limitations or maximums....

- Covered services for the treatment of Mental Disorders (mental health and behavioral health) and Chemical Dependency (substance abuse) are subject to the same Deductible(s) and Copayments are required for the services when provided for a medical condition.

- *Chemical Dependency* is alcoholism, drug addiction or other Chemical Dependency problems.

**Covered Benefits: Mental Health, Behavioral Health and Substance Use Needs Includes:**

- *Outpatient office visits* (psychological evaluation or therapeutic session in an office or other outpatient setting, including individual and group therapy sessions, medication management and drug therapy monitoring)

- *Outpatient services other than office visits* (psychological and neuropsychological testing, intensive outpatient care program, day treatment, partial hospitalization, medical treatment for withdrawal symptoms and other outpatient services)

    o *Intensive outpatient care program* is a treatment program that is utilized when a patient's condition requires structure, monitoring, and medical/psychological intervention at least three (3) hours per day, three (3) times per week.

    o *Partial Hospitalization/day treatment program* is a treatment program that may be free-standing or Hospital-based and provides services at least four (4) hours per day and at least four (4) days per week.

FIRST AMENDED COMPLAINT

- *Inpatient Services* include accommodations in a room of two or more beds, including special treatment units, such as intensive care units, unless a private room is Medically Necessary; supplies and ancillary services normally provided by the facility, including Physician services, laboratory services, drugs and medications dispensed for use during the confinement, psychological testing and individual, family or group therapy or counseling; and Medically Necessary services in a Residential Treatment Center unless otherwise excluded.

- *Inpatient Detoxification* includes hospitalization only for medical management or withdrawal symptoms, including room and board, Physician services, drugs, dependency recovery services, education and counseling.

- *Physician visit to hospital, behavioral health facility or Residential Treatment Center*

124.  Defendants, and each of them, insure, sponsor, fund, serve as the designated plan administrator and/or serve as the named plan administrator's designee for the various ERISA health plans at issue.

125.  The ERISA health plans at issue expressly state that Defendants act as plan fiduciary and administrator, with discretionary authority and discretionary control respecting management of the plan benefits, sole discretionary authority and responsibility to interpret and construe the provisions of the plans and to determine all factual and legal questions under the plans, and the right to delegate such discretionary authority.

126.  The various ERISA health plans at issue fall into two categories – fully-funded and self-funded – but are administered the same.

127.  With respect to each ERISA plan at issue in this litigation that is a fully-funded plan, Defendants, and each of them are responsible for both

FIRST AMENDED COMPLAINT

administering and paying the claims from their own bank accounts, and are the plan administrators and ERISA fiduciaries for these plans.

128.   With respect to each ERISA plan at issue in this litigation that is a self-funded plan, Defendants, and each of them, administer these plans pursuant to an administrative service agreement, by which the self-funded ERISA plan sponsors delegated to Defendants, and each of them, the authority and responsibility for all administrative responsibilities, including *inter alia,* providing plan members with plan documents, interpreting and applying the plan terms, making coverage and benefits decisions, handling appeals of coverage and benefits decisions, and providing for payment from their own bank accounts in the form of claim reimbursements, and as such are the plan administrators and ERISA fiduciaries for these plans.

129.   With respect to each ERISA plan at issue in this litigation that is a self-funded plan, but which does not specifically designate a plan administrator, Defendants, and each of them, functioned as the *de facto* plan administrators and were specifically designated by the ERISA plan sponsors as the claims administrator, with the same fiduciary duties as expressly designated plan administrators, and as such are the plan administrators and ERISA fiduciaries for these plans.

130.   With respect to each ERISA plan at issue in this litigation that is a self-funded plan, Defendants, and each of them, make all benefit determinations and authorize benefit checks to be issued out of their own bank accounts.  Periodically, Defendants, and each of them, will notify the ERISA self-funded plan sponsors of the need to replenish their accounts so that benefits can be paid.  Defendants, and each of them, control these accounts and are fully responsible for processing the insurance claims and making the determination whether to issue a benefits payment check from these accounts.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

131.   As alleged herein, Defendants, and each of them, acted as agents for each other with regard to processing the claims under the ERISA plans at issue. With respect to the ERISA plans, whether fully-funded or self-funded, Defendants, and each of them, are the proper parties for Plaintiffs to sue because Defendants, and each of them, not the underlying plan sponsor or employer, made and continue to make all the relevant decisions whether to honor or deny claims under the ERISA plans, and exercised and continue to exercise the authority to issue benefit payment checks under the ERISA plans form their own bank accounts.

132.   After providing covered treatment and services to the 27 insureds at issue, Plaintiffs submitted their claims to Defendants for payment in accordance with the procedures for receiving benefits under the terms of the ERISA plans, with the claim forms notifying Defendants that Plaintiffs were submitting the claims as the insureds' assignee.  Defendants were obligated – under the law and the ERISA plans – to pay Plaintiffs the applicable plan percentage of their covered charges (50% of billed charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

133.   Instead of paying Plaintiffs per the ERISA plan documents and the law, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Plaintiffs, as a group, an average of 1.9% of their covered charges.  Specifically, Defendants only paid $51,710.72 out of Plaintiffs' $3,232,419.10 in covered charges.  It was only after Plaintiffs rendered the treatment and services at issue that Defendants refused to properly compensate Plaintiffs for the covered treatment and services rendered to Defendants' insureds.

134.   Defendants never informed or advised Plaintiffs during the claims or post-claims process of any anti-assignment ERISA plan terms, and Defendants have thereby waived and are estopped from asserting any anti-assignment plan terms in this action.  See fn. 2, *supra*.  Likewise, Defendants never provided Plaintiffs with

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COMPLAINT

the ERISA plan documents, and Defendants, and each of them, made benefit determinations that were not based on individual plan terms.  Similarly, Defendants never provided Plaintiffs with notice of any administrative remedy provisions, limitation of action provisions or any other conditions to coverage under the terms of the plans.

135.   During the claim submission and payment process, Defendants put Plaintiffs on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Plaintiffs, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  Plaintiffs complied with Defendants' repetitive requests and despite being promised payment pursuant to, *inter alia*, the ERISA plans and/or repricing agreements, Defendants refused to properly reimburse Plaintiffs for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide Plaintiffs and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Plaintiffs and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flags and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Plaintiffs (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with the law and the ERISA plans.

136.   Plaintiffs have made all reasonable efforts to have Defendants adjudicate their claims, and have provided Defendants with thousands of pages of treatment records, none of which Defendant even consider for determining coverage.  Plaintiffs have exhausted or by law are deemed to have exhausted their

- 47 -

FIRST AMENDED COMPLAINT

administrative remedies under the ERISA plans at issue, and moreover, Defendants' herein explained pattern of misconduct and misbehavior rendered all potential and further administrative remedies futile.

137.   Not all of the ERISA plans at issue require the exhaustion of administrative remedies as a condition precedent to Plaintiffs taking legal action, and those having such conditions couch the material terms of the appeal and grievance process as an optional procedure, stating that if a claim for plan benefits is denied, the insured member or an authorized representative, such as the provider, *may* participate in Defendants' appeals and grievance process.

138.   Out of network providers who have been assigned their patients' rights to reimbursement, such as Plaintiffs, have standing to pursue ERISA claims against Defendants, and their assigned right to reimbursement includes the ability to seek judicial enforcement of that right in this action.

139.   ERISA notice and appeal rights belong to the party with the legal right to payment,[12] and the Department of Labor ("DOL") maintains that providers who have been assigned their patients' rights to reimbursement, such as Plaintiffs, are entitled to insist upon their assigned right to challenge the allegedly wrongful decision to deny benefits through a process that complies with the ERISA Claims Regulation.[13]

140.   Defendants failed to provide Plaintiffs with proper notice of their appeal rights pursuant to ERISA Claims Regulation (29 C.F.R. § 2560.503-1), which is consistent with Defendants' custom and practice of only giving notice of

---

[12] *See Premier Health Ctr. v. UnitedHealth Grp.*, 292 F.R.D. 204, 221 (D.N.J. 2013) (Out of network providers who have been assigned their patients' rights to reimbursement have standing to pursue ERISA claims against United, and that "assignment of the right to reimbursement 'must logically include the ability to seek judicial enforcement of that right.'" *Id.*, citation omitted.

[13] *See Tri3 Enters., LLC v. Aetna, Inc.*, 2012 WL 6113799, at *29 (3d Cir. Nov. 30, 2012) (DOL Amicus Brief) (Out of network providers who have been assigned their patients' rights to reimbursement are "entitled to insist upon [their] assigned right to challenge the allegedly wrongful decision to deny benefits through a process that complies with the [ERISA] claims regulation."

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

ERISA appeal rights—if they give notice at all—to parties least likely to exercise them (patients who have assigned their right to payment to providers), and deny those rights to parties most likely to exercise them (providers who have been assigned the right to payment).  Defendants' failure to provide Plaintiffs with proper notice of their appeal rights pursuant to ERISA Claims Regulation is a systematic violation of ERISA, deeming the administrative remedies exhausted,[14] constituting a waiver of any condition requiring exhaustion of administrative remedies under the ERISA plans at issue, and estopping Defendants from asserting administrative exhaustion as a defense.

141.   Even when these similarly situated Plaintiffs sought to enforce their assigned appeal rights in response to Defendants' wrongful denials and underpayment of plan benefits for similarly situated patients, by giving notice in accordance with the ERISA plans offering an appeal and grievance procedure, and supplying the requisite information and documents, Plaintiffs exhausted the administrative remedies to no avail.  Defendants repeatedly requested more and more records (even duplicate requests), conducted sham peer to peer reviews and ultimately upheld their denials and underpayments, representing to Plaintiffs that Defendants' decision was final and "no further steps needed to be taken," and not advising Plaintiffs of any further conditions on Plaintiffs' rights to litigate the ERISA claims at issue.  All of these facts and circumstances, along with Defendants' insistence that it owes not a penny of the more than $3 million in benefits at issue in this action, render it reasonable for Plaintiffs to conclude that the

---

[14] 29 C.F.R. § 2560.503–1(*l*); *see Barboza v. California Ass'n of Professional Firefighters* (9th Cir. 2011) 651 F.3d 1073, 1076 ("when an employee benefits plan fails to establish or follow 'reasonable claims procedures' consistent with the requirements of ERISA, a claimant need not exhaust because his claims will be deemed exhausted"); *see also Downey Surgical Clinic, Inc. v. Ingenix, Inc.* (C.D. Cal., May 30, 2014, No. CV 09-5457 PSG (CTX)) 2014 WL 12558848, at *5–6.

FIRST AMENDED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

pursuit of an administrative appeal to Defendants would be futile.[15]

142. Defendants, and each of them, have failed to process Plaintiffs' claims in a manner consistent with ERISA, by, among other acts and omissions:

    a.  Delaying the processing, adjustment and/or payment of claims for periods of time greater than 45 days after submission of the claims in violation of 29 C.F.R. §2560.503-1(f)(2)(iii)(B);

    b.  Failing and refusing to provide any notice and/or explanation for the denial of benefits, payments or reimbursement of the claims of each of the insureds, in violation of 29 U.S.C. §1133(1);

    c.  Failing and refusing to provide an adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims of each of the insureds, in violation of 29 U.S.C. § 1133(1);

    d.  Failing and refusing to provide an explanation for the denial of benefits, payments or reimbursements of claims of each of the insureds, and by failing and refusing to set forth the specific reasons for such denials, all in violation of 29 U.S.C. §1133(1);

    e.  Failing and refusing to provide an explanation for the denial of benefits, payments or reimbursements of claims of each of the insureds, written in a manner calculated to be understood by the participant, in violation of 29 U.S.C. § 1133(1);

    f.  Failing to afford Plaintiffs and/or their patient insureds with a

---

[15] *See In re WellPoint, Inc. Out-of-Network UCR Rates Litigation,* 865 F.Supp.2d 1002, 1041–1042 (C.D. Cal. 2011) (providers demonstrated futility by pointing to similarly situated plaintiffs who exhausted administrative remedies to no avail; *see also Perkins v. Prudential Insurance Company of America,* 417 F.Supp.2d 1149, 1153 (C.D. Cal. 2006) (plaintiff's showing of futility sufficient where the long history of claims and lawsuits between the plaintiff and the insurer showed that the insurer "consistently refused to pay [the plaintiff's] benefits until sued."); *see also Melczer v. Unum Life Ins. Co. Am.,* 2009 WL 792502 (D. Ariz. March 24, 2009) (futility adequately shown where there was evidence regarding the lack of reviews done by the insurer in initial determination of claim such that appeal would be futile).

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

reasonable opportunity to engage in an appeals process, in violation of 29 U.S.C. §1133(2);

g.    Failing to afford Plaintiffs and/or their patient insureds with a reasonable opportunity to engage in meaningful appeal process which was full and fair, in violation of 29 U.S.C. §1133(2);

h.    Failing and refusing to provide Plaintiffs and/or their patient insureds with information pertaining to their rights to appeal, including not limited to those deadlines for filing appeals and/or the requirements that an appeal be filed, in violation of 29 U.S.C. §1133(1);

i.    Violating the minimum requirements for employee benefit plans pertaining to claims and benefits by participants and beneficiaries, in violation of 29 C.F.R. § 2560.503-1(a), *et seq.*;

j.    Failing and refusing to establish and maintain reasonable claims procedures in violation of 29 C.F.R. § 2560.503-1(b);

k.    Establishing, maintaining and enforcing claims procedures which unduly inhibit the initiation and processing of claims for benefits, in violation of 29 C.F.R. §2560.503.1(b)(3);

l.    Precluding and prohibiting Plaintiffs from acting as authorized representatives of the patient insureds in pursuing a benefit claim or appeal of an adverse benefit determination, in violation of 29 C.F.R. §2560.503-1(b)(4);

m.    Failing and refusing to design, administer and enforce their processes, procedures and claims administration to ensure that their governing plan documents and provisions have been applied consistently with respect to similarly situated participants, beneficiaries and claimants, in violation of 29 C.F.R. §2560.503-1(b)(5);

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

n.    Failing and refusing to pay benefits for services rendered by Plaintiffs which Defendants authorized, as well as rescinding the same, in violation of California Health & Safety Code §1371.8 and California Insurance Code §796.04;

o.    Failing to offer coverage for mental health and substance use disorder treatment and laboratory services in parity with the medical and surgical benefits afforded by the same plans, as required by 26 U.S.C. §9812(3), as well as other mandates set forth at 26 U.S.C. §9812, *et seq.*; and

p.    Failing and refusing to pay Plaintiffs for the substance use disorder treatments and laboratory services provided to the patient insureds in violation of 26 U.S.C. § 9812(3).

143.   Defendants' failure and refusal to provide coverage, reimbursement, payment and/or benefits for the substance use disorder treatment and laboratory services that Plaintiffs rendered to Defendants' insureds/members, and Defendants' denial of health insurance benefits coverage, constitute breaches of the ERISA plans at issue. Plaintiffs seek reimbursement and compensation for all payments which they would have received and to which they are entitled to receive as a result of Defendants' breaches and failure to pay benefits and cover the treatments and services rendered by Plaintiffs to Defendants' insureds/members, in amounts according to proof at trial.

144.   Defendants have arbitrarily and capriciously breached the obligations set forth in the ERISA plans at issue, and as regulated by ERISA and implementing regulations incorporated into the plans, and Defendants have arbitrarily and capriciously breached their obligations under the ERISA plans to provide Plaintiffs and the patient insureds with health benefits.

145.   To remedy Defendants' wrongful conduct, Plaintiffs seek an order awarding them an amount equal to the amount of benefits Plaintiffs should have

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COMPLAINT

received and to which the patient insureds would have been entitled had Defendants paid the proper amounts, in amounts according to proof at trial, as direct and proximate result of the denial of plan benefits and other wrongful conduct by Defendants, and each of them, as alleged herein.

146.   Plaintiffs are entitled to an award of reasonable attorney's fees pursuant to 29 U.S.C. § 1132(g)(1).  As a result of the actions and failings of Defendants, and each of them, Plaintiffs have retained the services of legal counsel and have necessarily incurred attorney's fees and costs in prosecuting this litigation. Furthermore, Plaintiffs anticipate incurring additional attorney's fees and costs hereafter pursing this litigation and recovery of amounts due and owed by Defendants.

## SECOND CAUSE OF ACTION
### Breach of Written Contract
### (Non-ERISA Plans)
### Against All Defendants

147.   Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

148.   Plaintiffs allege this cause of action in connection with their claims for substance use disorder treatment services rendered to those of Defendants' 27 insureds with health insurance plans not governed by ERISA.  Plaintiffs bring this cause of action as assignees and third party beneficiaries of the non-ERISA plans at issue.

### A.   Assignees

149.   Plaintiffs are out-of-network substance use disorder treatment providers.  Plaintiffs are in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  Plaintiffs provided medically necessary, verified, preauthorized and covered substance use disorder treatment and laboratory

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COMPLAINT

services to 27 individuals with health insurance that was sold, insured, managed and/or administered by Defendants, including the non-ERISA plans.  The treatment and services provided by Plaintiffs include RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, individual, family and group therapy, medication management, case management services, and laboratory services to, among other things, determine, measure, or otherwise describe the presence or absence of various substances in the body.

150.   Defendants' health insurance plans, for each of the 27 insureds at issue, including the non-ERISA plans, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that out-of-network covered substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

151.   Defendants' health insurance plans, for each of the 27 insureds at issue, including the non-ERISA plans, pay benefits for out-of-network substance use disorder treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services, at 50% of covered charges until the insured's nominal annual out-of-pocket

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

maximum is met at which time Defendants pay 100%.  Plaintiffs are informed and believe, and based thereon allege, that each of the 27 insureds had already met their annual out-of-pocket maximum at the time they first received treatment or services from Plaintiffs, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received. Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers and clinical laboratories.  The exclusions, conditions and limitations in the plans do not apply to the treatments and services provided by Plaintiffs.

152.    Plaintiffs obtained oral and written assignments of benefits from each of the 27 insureds at issue, by which Defendants' insureds intended to, and did, assign to Plaintiffs not only his/her rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.

153.    Moreover, Defendants confirmed, represented, promised and warranted to Plaintiffs through the required verification of benefits and the preauthorization process, that each of the insureds and his/her respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that Plaintiffs would be properly paid for treating Defendants' insureds.  At all times relevant herein, Defendants knew that Plaintiffs were treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, fully aware of Plaintiffs' charges for the treatment and services rendered.

154.    After providing covered treatment and services to the 27 insureds at issue, Plaintiffs submitted their claims to Defendants for payment.  Defendants were obligated – under the law and the plans – to pay Plaintiffs the applicable plan percentage of their covered charges (50% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

Instead of paying Plaintiffs per the plan documents and the law, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Plaintiffs, as a group, an average of *1.9%* of their covered charges. Specifically, Defendants only paid $51,710.72 out of Plaintiffs' $3,232,419.10 in covered charges.

155.   Plaintiffs have performed all, or substantially all, of the significant things required of them under the health insurance plans, except as excused by Defendants' material breaches.

156.   Defendants, and each of them, breached the health insurance plans by the conduct alleged herein, including without limitation withholding of proper claim payments from Plaintiffs, making unreasonable demands on Plaintiffs, not engaging in a prompt, full and complete investigation of Plaintiffs' claims, and interpreting the plans in an unduly restrictive manner so as to deny coverage and benefits when, in fact, coverage exists and benefits are owed to Plaintiffs.

157.    As a direct and proximate result Defendants' breaches, Plaintiffs have suffered and will continue to suffer in the future, economic loss, including the benefits owed under the health insurance plans and the law in the millions, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits, and other general, incidental and consequential damages, in amounts according to proof at trial.  Plaintiffs are also entitled to recover statutory and prejudgment interest against Defendants, and each of them.

## B.   Third Party Beneficiaries

158.   Plaintiffs are also express and intended third-party beneficiaries of the non-ERISA health insurance plans between Defendants and the 27 insured patients treated by Plaintiffs, and are entitled to recover on that basis.

159.   Defendants and their insureds intended that Plaintiffs directly benefit from the health insurance plans and the plans indicate the intent to benefit Plaintiffs

FIRST AMENDED COMPLAINT

by payment for the services provided to Defendants' insureds.

160. The health insurance plans issued, managed and/or administered by Defendants provide their insureds with the option of seeking treatment with Defendants' in-network providers or choosing their own out-of-network providers, like Plaintiffs. The plans also provide for the payment of benefits for out-of-network providers, like Plaintiffs, who provide medically necessary services to the insureds. Although the plans issued, managed and/or administered by Defendants may incentivize their insureds to seek treatment with in-network providers, the plans explicitly express Defendants' intent to benefit out-of-network providers, like Plaintiffs.

161. The health insurance plans issued, managed and/or administered by Defendants further express Defendants' intent to benefit out-of-network providers, like Plaintiffs, insofar as the plans expressly incorporate by reference regulations requiring insurers, like Defendants, to provide an adequate network of providers and, in the event of a "network inadequacy" or "network gap," requiring insurers, like Defendants, to pay for the required care with available and accessible out-of-network providers, like Plaintiffs, with the insureds responsible for paying only cost-sharing in an amount equal to the cost-sharing they would have paid for provision of that or a similar service by an in-network provider.

162. Defendants' intent to benefit out-of-network providers, like Plaintiffs, by the terms of the health insurance plans at issue is further evidenced by the conduct of the Defendants, who issued payments to out-of-network providers, including Plaintiffs, for the medically necessary services rendered to their insureds, in accordance with the terms of the plans, until in or around 2015, when the Defendants, as part of their scheme to decrease their costs on mental health and substance use disorder treatment claims, conspired, concocted and implemented their plans to significantly decrease, and in some cases completely ceased reimbursing out-of-network providers providing substance use disorder treatment

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

1   and related services, including Plaintiffs.

2       163.   As set forth hereinabove, Plaintiffs provided covered, verified,

3   preauthorized and medically necessary substance use disorder treatment and

4   laboratory services to Defendants' insureds, all 27 of them, at great expense to

5   Plaintiffs.  After providing the services, Plaintiffs submitted their claims to

6   Defendants for payment, requesting compensation for the treatment and services

7   provided to the insureds.

8       164.   Plaintiffs have performed all, or substantially all, of the significant

9   things required of them under the health insurance plans, except as excused by

10  Defendants' material breaches.

11      165.   Defendants were obligated – under the law and the plans – to pay

12  Plaintiffs the applicable plan percentage of their covered charges (50% of covered

13  charges) until the insured's nominal annual out-of-pocket maximum is met at which

14  time Defendants pay 100%.  Instead of paying Plaintiffs per the plan documents and

15  the law, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent

16  and systematic polices, practices and decisions – with an emphasis on profits over

17  patients – and paid Plaintiffs, as a group, an average of *1.9%* of their covered

18  charges. Specifically, Defendants only paid $51,710.72 out of Plaintiffs'

19  $3,232,419.10 in covered charges.

20      166.   Defendants, and each of them, breached the health insurance plans by

21  the conduct alleged herein, including without limitation withholding of proper claim

22  payments from Plaintiffs, making unreasonable demands on Plaintiffs, not engaging

23  in a prompt, full and complete investigation of Plaintiffs' claims, and interpreting

24  the plans in an unduly restrictive manner so as to deny coverage and benefits when,

25  in fact, coverage exists and benefits are owed to Plaintiffs.

26      167.   As a direct and proximate result Defendants' breaches, Plaintiffs have

27  suffered and will continue to suffer in the future, economic losses, including the

28  benefits owed under the health insurance plans in the millions, the interruption in

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

FIRST AMENDED COMPLAINT

Plaintiffs' businesses, lost business opportunities, lost profits, and other general, incidental and consequential damages, in amounts according to proof at trial. Plaintiffs are also entitled to recover statutory and prejudgment interest against Defendants, and each of them.

## THIRD CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

### Against All Defendants

168.   Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

169.   Plaintiffs allege this cause of action in connection with their claims for substance use disorder treatment and laboratory services rendered to the 27 insureds with health insurance plans not governed by ERISA.

170.   As alleged herein, Plaintiffs are assignees and intended beneficiaries of their patients' health insurance plans issued, managed and/or administered by Defendants and the rights conferred thereunder.

171.   Each health insurance plan contains an implied covenant of good faith and fair dealing that obligates each party to do nothing to injure the right of the other party to receive the benefits of the agreement.

172.   As set forth herein, Plaintiffs provided covered, verified, preauthorized and medically necessary substance use disorder treatment and laboratory services to Defendants' insureds with the understanding and expectation that Defendants would act in good faith and deal fairly with Plaintiffs pursuant to the plans.  Defendants and each of them, however, tortiously breached the plans and the implied covenant of good faith and fair dealing, and committed unfair and deceptive acts and practices in direct violation of California's Unfair Insurance Practices Act (Cal. Ins. Code § 790 *et seq.*) and Fair Claims Settlement Practices Regulations (Cal. Code Regs. tit. 10, § 2695.1, *et seq.*) in the following ways, among others:

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

a.    Misrepresenting to Plaintiffs pertinent facts and insurance policy provisions relating to the coverages at issue (Cal. Ins. Code § 790.03(h)(1));

b.    Failing and refusing to acknowledge and act reasonably promptly upon Plaintiffs' communications with respect to the claims at issue (Cal. Ins. Code § 790.03(h)(2));

c.    Failing and refusing to adopt and implement reasonable standards for the prompt investigation and processing of the claims at issue (Cal. Ins. Code § 790.03(h)(3));

d.    Failing and refusing to affirm or deny coverage of the claims at issue within a reasonable time after proof of Plaintiffs' entitlement to benefits had been established (Cal. Ins. Code § 790.03(h)(4));

e.    Not attempting in good faith to effectuate prompt, fair, and equitable settlements of the claims at issue despite proof of Plaintiffs' entitlement to benefits having been established (Cal. Ins. Code § 790.03(h)(5));

f.    Compelling Plaintiffs to institute litigation to recover amounts due on the claims at issue by offering substantially less than the amounts owed (Cal. Ins. Code § 790.03(h)(6));

g.    Delaying the investigation and payment of the claims at issue by requiring Plaintiffs to submit multiple reports and documents that contain substantially the same information (Cal. Ins. Code § 790.03(h)(11));

h.    Failing to and refusing promptly settle the claims at issue despite proof of Plaintiffs' entitlement to benefits having been established under one portion of the insurance policy's coverage in order to influence settlements under other portions of the insurance policy's coverage (Cal. Ins. Code § 790.03(h)(12));

i.    Failing to and refusing promptly provide a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of the claims at issue or for the offer of a compromised amount on the benefits owed (Cal. Ins. Code § 790.03(h)(13));

j.      Discriminating in its claims settlement practices based upon the physical disabilities of Plaintiffs' patients/Defendants' insureds (Cal. Code Regs. tit. 10, § 2695.7(a));

k.      Failing and refusing to conduct and diligently pursue a thorough, fair and objective investigation and persisting in seeking information not reasonably required for or material to the resolution of the claims at issue (Cal. Code Regs. tit. 10, § 2695.7(d));

l.      Unjustifiably seeking reimbursement of an overpayment and withholding benefits payable as a result of a claim on the basis that the sum withheld or reimbursement sought is an adjustment or correction for an overpayment (Cal. Code Regs. tit. 10, § 2695.11(a));

m.      Failing and refusing to provide Plaintiffs with an explanation of benefits that includes a clear explanation of the computation of benefits (Cal. Code Regs. tit. 10, § 2695.11(b));

n.      Failing and refusing to affirm or deny contested claims within 30 calendar days from the original notification that the claims at issue were being contested (Cal. Code Regs. tit. 10, § 2695.11(d));

o.      Adopting unreasonable medical necessity standards that indiscriminately reduce the amount of authorized substance use disorder treatment available to their insureds;

p.      Bullying Plaintiffs into adopting these unreasonable standards by threatening to withhold righteous claim payments;

q.      Interpreting the plans in an unduly restrictive manner so as to deny coverage and benefits when, in fact, coverage exists and benefits are owed to Plaintiffs;

r.      Making unreasonable demands on Plaintiffs;

s.      Not engaging in a prompt, full and complete investigation of Plaintiffs' claims;

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

t.    Fraudulently representing to Plaintiffs that Defendants would pay the claims in accordance with the plans;

u.    Forcing Plaintiffs to file appeals and requests for external peer reviews to obtain authorization for medically necessary treatment, and to obtain proper medically necessity determinations for post-service claim reimbursements;

v.    Failing and refusing to pay benefits for services rendered by Plaintiffs that Defendants authorized, as well as rescinding the same (Cal. Health & Safety Code §1371.8; Cal. Ins. Code §796.04);

w.    Failing and refusing to offer coverage for mental health and substance use disorder treatment and related laboratory services in parity with the medical and surgical benefits afforded by the same plans (26 U.S.C. §9812, *et seq.*); and

x.    Failing to abide by the rules and regulations promulgated by the CDI and the DMHC as alleged herein, and by other acts and omissions of which Plaintiffs are presently unaware and which will be shown according to proof at the time of trial.

173.    In committing these unfair and deceptive acts and practices in direct violation of California's Unfair Insurance Practices Act and Fair Claims Settlement Practices Regulations, Defendants and each of them not only breached their express contractual covenants to properly reimburse medically necessary covered claims, but also tortiously breached the implied covenant of good faith and fair dealing, frustrating the purpose of the insurance contracts by denying and underpaying benefits without any justification, unreasonably delaying adjudication of Plaintiffs' claims in an oppressive effort to force Plaintiffs to accept less than what they are owed under the plans, and leaving Plaintiffs without any notice of a right to appeal Defendants' adverse benefit determinations and forcing Plaintiffs to incur the unreasonable expense of attorney fees and litigation costs to pursue the wrongfully denied and withheld benefits, which fees and costs are not recoverable under the

insurance contract but which were proximately caused by Defendants' tortious conduct.

174.   Upon information and belief, the conduct of Defendants, and each of them, as alleged herein constitutes part of an institutional illegal pattern and practice of bad faith and unlawful insurance practices.

175.   Defendants' conduct constitutes a continuing tort that is causing Plaintiffs continued damages.

176.   The conduct of Defendants, and each of them, as alleged herein was undertaken by Defendants' officers, directors or managing agents who were responsible for supervision, operation, reports, communication and decisions.  The conduct of said officers, directors and managing agents, and of other employees, representatives and agents, was undertaken on behalf of Defendants, which had advance knowledge of the action and conduct of said individuals whose conduct and actions were authorized, ratified and approved by officers, directors or managing agents of Defendants.

177.   As a direct and proximate result Defendants' breaches, Plaintiffs have suffered and will continue to suffer in the future, economic losses, including the benefits owed under the health insurance plans in the millions, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits, and other general, incidental and consequential damages, in amounts according to proof at trial. Plaintiffs are also entitled to recover statutory and prejudgment interest against Defendants, and each of them.

178.   As a direct and proximate result of Defendants' breaches, Plaintiffs have incurred attorney's fees and costs as a result of efforts to secure the insurance benefits owed, in an amount according to proof.  Plaintiffs are also entitled to recover statutory and prejudgment interest against Defendants, and each of them.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

# FOURTH CAUSE OF ACTION

## Promissory Estoppel

## Against All Defendants

179.  Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

180.  As part of verifying benefits and authorizing treatment when necessary, in multiple communications following admissions and the submission of claims, and in multiple communications following Plaintiffs providing the covered treatment and services to Defendants' insureds, Defendants expressed a clear promise to pay Plaintiffs on the same terms as provided for in the plans between Defendants and their insureds; specifically, payments to Plaintiffs equal to a percentage of their covered charges (50% covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

181.  The persons answering calls and corresponding on behalf of Defendants, and each of them, were upon information and belief the agents and employees of Defendants, and each of them, and in doing the things herein alleged were acting within the course and scope of such agency and employment and with the permission and consent of Defendants, and each of them.

182.  Plaintiffs relied on Defendants' promises in providing treatment and services to Defendants' insureds, and Defendants, and each of them, should reasonably have expected to induce Plaintiffs' action in providing treatment and services. Plaintiffs also relied on Defendants' promises of payment following Plaintiffs' treatment of the 27 insureds.  In other words, even after failing to pay following submission of the claims by Plaintiffs, Defendants continued to promise payment to Plaintiffs.

183.  Plaintiffs have suffered substantial detriment in reliance upon Defendants' promises in providing treatment to Defendants' insureds, including without limitation the benefits owed in the millions, the interruption in Plaintiffs'

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

businesses, lost business opportunities, lost profits and other consequences, all according to proof.

184.   As a direct and proximate result of Defendants' breach of their promises, Plaintiffs are also entitled to statutory and prejudgment interest and attorney's fees against Defendants.

## FIFTH CAUSE OF ACTION

### Unfair Competition

### Against All Defendants

185.   Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

186.   The conduct of Defendants, and each of them, as alleged herein not only constitutes common law bad faith, but also violates state and federal law, regulations and policies, and thus constitutes unlawful, unfair, and fraudulent business practices in violation of the UCL (Bus. & Prof. Code §§ 17200 *et seq.*).

187.   Plaintiffs have suffered injury in fact and have lost money as a result of the unlawful conduct of Defendants, and each of them, as alleged herein, including but not limited to Defendants' wrongful denials and underpayment of claims inconsistent with the plan terms; refusal to honor the patients' valid assignments of rights for Plaintiffs to pursue their legal right to the health plan benefits; refusal to give Plaintiffs notice of their right to appeal the unreasonable adverse benefit determinations and then contending Plaintiffs have no legal right to the benefits owed for not exhausting the concealed administrative appeal process; delaying interminably the adjudication of claims with pretext audits and demands for documents, information and sham peer to peer reviews; and refusing to pay even those claims determined to be covered and owing because of cross-plan offsetting for alleged overpayment of prior claims.  All of this conduct was unlawful and designed specifically to deprive Plaintiffs and all other similarly situated out of network substance use disorder providers of their legal entitlement to reimbursement

for medically necessary covered services rendered to Defendants' insureds.

188.   The wrongful conduct of Defendants and each of them has proximately caused direct injury to Plaintiffs and all other similarly situated out of network substance use disorder providers in the form of lost revenue necessary to keep their businesses in operation.  Defendants maintain an institutional pattern and practice of denying and underpaying out of network substance use disorder through the course of unlawful conduct alleged herein, with the intent of reducing the amount of benefits paid for such essential health care services that the PPACA mandates they cover.

189.   As courts have held that a patient who has assigned his rights to his provider has no standing to challenge Defendants' practice of impermissibly requiring prior authorization for certain levels of care in order to wrongfully deny coverage; to challenge Defendants impermissible refusal to pay for covered and medically necessary claims for benefits; to challenge Defendants' practice of unlawfully demanding refunds or refusing to cover and pay for covered claims for individuals under one plan based on purported overpayments to other individuals covered by other plans; to challenge Defendants' refusal to cover and pay for covered counseling and behavioral therapy, case and treatment management services, pharmacologic management services, and breathalyzer testing; to challenge Defendants' refusal to cover and pay for covered clinical laboratory claims based upon arbitrary numerical limitations; or to challenge Defendants' systematic and willful underpayment of claims, including the substitution of an improper Medicare rate payment methodology for substance use disorder treatment claims, notwithstanding the increased out of pocket expense that results for the insured patient,[16] Plaintiffs and all other similarly situated out of network substance use disorder providers are the aggrieved parties who must hold Defendants accountable

---

[16] *See Ryan S. v. UnitedHealth Grp., Inc., et al.,* 2020 WL 8028609, at *4–6 (C.D. Cal. Dec. 3, 2020).

FIRST AMENDED COMPLAINT

1   for their unfair and unlawful conduct.

2       190.  Plaintiffs are entitled to injunctive relief under the UCL and, as such,

3   Plaintiffs seek a temporary restraining order, a preliminary injunction, and a

4   permanent injunction, all enjoining Defendants, and each of them, from

5   unjustifiably withholding proper payment of claims.

6       191.  Plaintiffs are further entitled to an order appointing a receiver over

7   Defendants, and each of them, and restoring to Plaintiffs any money or property that

8   was acquired through the foregoing acts of unfair competition (Cal. Bus. & Prof.

9   Code § 17203).

10   ### PRAYER

11       **WHEREFORE**, Plaintiffs pray for judgment against Defendants, and each of

12   them, and that the Court award the following relief:

13       1.    For compensatory, general and special damages in amounts to be

14       proven at trial;

15       2.    For statutory and prejudgment interest;

16       3.    For costs incurred in connection with this lawsuit;

17       4.    For attorney's fees;

18       5.    For injunctive and equitable relief; and

19       6.    For all other relief the Court deems just and proper.

20   ### DEMAND FOR JURY TRIAL

21       Plaintiffs hereby request a trial by jury.

22

23   Dated:  July 20, 2021        **CALLAHAN & BLAINE, APLC**

24

25           By: _____

26              Richard T. Collins
                Damon D. Eisenbrey

27              Adrian L. Canzoneri
                Attorneys for Plaintiffs, Ventura Recovery
                Center, Inc., Hillside Laguna Beach, LLC

28              and Sheer Recovery, LLC

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM